WILLIAM B. ROBERTS, INC., et al., Appellants,

v.

McDRILLING COMPANY, INC., Appellee.

No. 1356.

Court of Civil Appeals of Texas, Corpus Christi.

March 22, 1979.

Rehearing Denied April 12, 1979.

336

William B. (Ben) Adair, Houston, for appellants.

William H. Scott, Jr., Browne & Moore, Houston, for appellee.

## OPINION

BISSETT, Justice.

This is a suit to recover damages for breach of written contract, or, in the alternative, for fraud relating to the drilling of two wells, the Emma Oates well and the H. L. & P. well, in search of oil or gas. In the trial court, McDrilling Company, Inc., was plaintiff. William B. Roberts, Inc., and William B. Roberts, individually, were defendants. Following a jury trial, judgment was rendered in favor of plaintiff against defendants, jointly and severally, in the total sum of $101,493.09, together with interest thereon at the rate of 9% per annum from date of judgment (January 17, 1978) until paid. Defendants have appealed.

According to the makeup and context of plaintiff's pleadings, it sued to recover actual damages in the amount of $52,306.57 due, first, because of the fraud allegedly perpetrated on it by defendants, or, in the alternative, the identical sum of $52,306.57 alleged to be due it by defendants under written contracts for the drilling of the wells. Plaintiff alleged that defendants, from the very beginning of their dealings with plaintiff, were motivated and actuated by an intent to defraud plaintiff in the drilling of the Emma Oates and H. L. & P. wells, and in order to carry out their scheme not to pay for all costs pertaining to the drilling of those wells, made material misrepresentations to plaintiff to induce plaintiff to drill the Emma Oates and H. L. & P. wells pursuant to written contract, and concealed from plaintiff their secret intention not to pay all of plaintiff's charges for the work to be performed under the contracts. Plaintiff further sought a recovery of punitive damages, and also asked for reasonable attorneys' fees because of breach of contract.

Defendants, in addition to special and general denials, pled several affirmative defenses to the action brought by plaintiff. Included in such affirmative defenses, but not by way of limitation, are claims for offsets because of negligence of plaintiff's drilling crews and overcharges by plaintiff.

Twenty-seven special issues were submitted. The jury found:

(No. 1.) When Roberts signed the contract on the Emma Oates well, he then intended not to pay for a substantial part of plaintiff's charges for work to be performed;

(No. 2.) When plaintiff performed work on the Emma Oates well, plaintiff relied on Roberts' promise to pay;

(No. 3.) When Roberts signed the contract on the H. L. & P. well, he then intended not to pay for a substantial part of plaintiff's charges for work to be performed;

(No. 4.) When plaintiff performed work on the H. L. & P. well, he relied on Roberts' promise to pay;

(No. 5.) Roberts concealed from plaintiff his intent to charge the plaintiff the cost of outside services incurred in freeing the stuck pipe, by deducting such costs from amounts due plaintiff;

(No. 6.) Such fact (had it not been concealed), would likely have affected plaintiff's judgment and performance on the Emma Oates well;

(No. 7.) Such fact (had it not been concealed), would likely have affected plaintiff's judgment and performance on the H. L. & P. well;

(No. 8.) Punitive damages in the sum of $22,500.00 should be awarded against defendants;

(No. 9.) The reasonable value of the services of plaintiff's attorneys in the case is $20,000.00;

(No. 10.) The insertion of the term "30 days" in the form contract so as to result in the provision for interest at the rate of 1½ percent per 30 days, was the result of a good faith error on the part of plaintiff; and,

(No. 11.) The parties intended at the time of the execution of the contracts that interest should be for the rate of 1.5% per month.

The remaining special issues (Numbers 12 through 27) were defendants' issues. They were answered unfavorably to defendants.

The court rendered judgment for plaintiff for $52,306.57, together with interest thereon at 6% per annum from and after December 1, 1975, to date of judgment, with said principal and interest amounting to $58,993.09, and for $20,000.00 as attorneys' fees, and for $22,500.00 for punitive damages, being a total of $101,493.09, together with interest on the total amount of the judgment at the rate of 9% per annum from and after the date of rendition of the judgment.

Defendants urge six points of error. Three are "no evidence" points.

■ In disposing of defendants' "no evidence" points, we follow the well-established rule which requires the appellate courts of this State to view the evidence in a light most favorable to and in support of the jury's findings and to consider only the evidence and permissible inferences which support such findings, and to reject the evidence and inferences contrary thereto. *Miller v. Riata Cadillac Company*, 517 S.W.2d 773 (Tex.Sup.1974).

■ Defendants in their first point of error, contend that there was no evidence that they committed an actionable tort in connection with a breach of contract, and therefore it was error to award punitive damages to plaintiff. We agree. Plaintiff's action is properly brought to recover damages for breach of contract, and such suit is not a basis for punitive damages since there is no evidence that the breach was tortious in nature.

While defendants do not bring forward points which directly challenge the submission of special issues 1 through 8, or the judgment insofar as it is based on the jury answers to those issues, on the ground of no evidence, the thrust of the point, when the statement and argument thereunder is considered, is such a challenge. Recent cases advocate a very liberal rule in determining the legal sufficiency of a point under our briefing rules. See *Bass v. Metzger*, 569 S.W.2d 917, 922 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n. r. e.). The precise nature of point 1 is a complaint against the

judgment, which awarded punitive damages, on the ground that there is no evidence to support the jury's findings, which, in effect, supplied the basis for a holding that defendants committed an actionable tort (fraud) in connection with a breach of contract. In disposing of the point, we must necessarily consider whether there was evidence to support the jury's answers to points 1 through 8 in order to determine the question of reversible error. See *O'Neil v. Mack Trucks, Inc.*, 542 S.W.2d 112 (Tex. Sup.1976), which states that a Court of Civil Appeals should look to the statement and argument under a point "to determine the question of reversible error."

■ To constitute actionable fraud, there must be a misrepresentation or concealment of a material fact intended to be believed and acted upon and actually believed or acted upon with consequential injury to the person acting thereon. Further, the complainant must not have failed to exercise reasonable care to protect himself. There cannot be actionable fraud in an arms length transaction when each of the parties are equally cognizant of the facts. *Moore & Moore Drilling Co. v. White*, 345 S.W.2d 550 (Tex.Civ.App.—Dallas 1961, writ ref'd n. r. e.); *Roan v. Reynolds*, 364 S.W.2d 763 (Tex.Civ.App.—Amarillo 1963, writ dism'd). Fraud is never presumed, and it is plaintiff's burden to allege and prove actionable fraud. *Turner v. Lambeth*, 2 Tex. 365 (1847); *Hawkins v. Campbell*, 226 S.W.2d 891 (Tex.Civ.App.—San Antonio 1950, writ ref'd n. r. e.); *Ramos v. Levinston*, 536 S.W.2d 273 (Tex.Civ. App.—Corpus Christi 1976, no writ); *Hazle v. McDonald*, 449 S.W.2d 343 (Tex.Civ.App. —Dallas 1969, no writ).

■ A person's intent is a question of fact, which may be established by circumstantial evidence in connection with a breach of contract, but the breach alone does not establish such fact. *Turner v. Biseoe*, 141 Tex. 197, 171 S.W.2d 118 (1943); *Seegers v. Spradley*, 522 S.W.2d 951 (Tex. Civ.App.—Beaumont 1975, writ ref'd n. r. e.). Mere proof of nonperformance of the contract will not support an inference of

fraudulent intent. *Medina v. Sherrod*, 391 S.W.2d 66 (Tex.Civ.App.—San Antonio 1965, no writ); *Collier v. Bankston-Hall Motors*, 267 S.W.2d 898 (Tex.Civ.App.—Dallas 1954, no writ).

As a general rule, a promise to perform some act in the future, although made for the purpose of inducing another to enter into a contract, will not amount to legal fraud, though at a later date, the promise, without any excuse, is broken. This is a plain and well established proposition of law; otherwise, every breach of contract would amount to fraud. In order for a promise to constitute fraud, it is necessary that it should have been made at a time when the promisor knew that it would not be performed. When a representation, in the nature of a promise to be performed in the future, is alleged as a basis for fraud, it must be shown that the person making the representation did not intend to perform at the proper time. *Cassel v. West*, 98 S.W.2d 437 (Tex.Civ.App.—Amarillo 1936, writ ref'd); *Stone v. Enstam*, 541 S.W.2d 473, 481 (Tex.Civ.App.—Dallas 1976, no writ). Furthermore, a subsequent representation cannot be considered in determining whether a contract was obtained by fraudulent representations, since a transaction which is originally valid cannot be rendered invalid by a representation made after the transaction was originally entered into by the parties. *Long v. Martin*, 112 Tex. 365, 247 S.W. 827 (1923); *Steine v. Hillcrest State Bank of University Park*, 423 S.W.2d 443 (Tex.Civ.App.—Dallas 1967, no writ); *Burchill v. Hermsmeyer*, 212 S.W. 767 (Tex.Civ.App.—Fort Worth 1919, no writ).

In fraud cases, generally speaking, punitive damages may not be awarded unless the act complained of is of a malicious or wanton nature, and such an award cannot be supported if all that is shown by the record is that the act is merely wrongful. *Ware v. Paxton*, 359 S.W.2d 897 (Tex. Sup.1969). It is also the general rule that punitive damages in fraud cases may be awarded when the plaintiff has suffered actual damages as the result of fraud *intentionally* committed by the defendant for the purpose of injury to the plaintiff, which our Supreme Court classified as "wilful and deliberate fraud." *Dennis v. Dial Finance & Thrift Company*, 401 S.W.2d 803, 805 (Tex. Sup.1966). See also *Woo v. Great Southwestern Acceptance Corporation*, 565 S.W.2d 290 (Tex.Civ.App.—Waco 1978, writ ref'd n. r. e.).

Punitive damages cannot be recovered in an action for breach of contract which is not accompanied by a tort, even though the breach is capricious and malicious. *A. L. Carter Lumber Co. v. Saide*, 140 Tex. 523, 168 S.W.2d 629 (1943); *Crutcher-Rolfs-Cummings, Inc. v. Ballard*, 540 S.W.2d 380 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.); *McDonough v. Zamora*, 338 S.W.2d 507 (Tex.Civ. App.—San Antonio 1960, writ ref'd n. r. e.).

All of the contracts, hereinafter described, were between William B. Roberts, Inc., (Roberts, Inc.), as "owner," and plaintiff, as "contractor." Mr. William B. Roberts (Roberts), president of Roberts, Inc., executed them for the owner, and Mr. Thomas K. Tomlinson (Tomlinson), president of plaintiff corporation executed them for the contractor.

Tomlinson was contacted by Roberts in August, 1975, in connection with defendants' desire to obtain a drilling contractor for the drilling of three wells, the Ruby Means well, the Emma Oates well and the H. L. & P. well. Roberts wanted the wells drilled on a "footage basis" and Tomlinson wanted to drill them on a "day-work basis." The difference between a "day-work" contract and a "footage" contract, basically stated, is that the contractor under a "footage" contract, agrees to drill to a stated depth for a fixed sum of money, while under a "day-work" contract, the contractor is paid a certain amount of money per day until the well is completed. Under a "footage" contract, the contractor assumes the burden of contending with unforeseen delays, while under a "day-work" contract the owner assumes the burden of such delays. An understanding was reached by and between Tomlinson and Roberts whereby it

was agreed that each well would be drilled on a "day-work basis" and that a written contract would thereafter be executed covering the drilling of each well.

A contract was duly executed on or about September 9, 1975, for the drilling of the Ruby Means well. Roberts, Inc., paid plaintiff $20,000.00 as an advance payment on the contract price. Drilling operations were finished on September 29, 1975. Shortly thereafter, the well was completed as a producer. Roberts was not completely satisfied with the work performed by plaintiff in the drilling of the well and registered certain complaints with Tomlinson, who after hearing the complaints told him: "We suggest that you get some other drilling contractor to drill these other two wells." Tomlinson further testified that Roberts indicated to him that "if he had sufficient time he might very well do that," but under the circumstances, he wanted plaintiff to drill the other two wells. Plaintiff, on October 2, 1975, invoiced Roberts, Inc., for $36,565.64, the balance due under the contract.

The contract for the drilling of the next well, the Emma Oates well, was signed by plaintiff on October 10, 1975, and by Roberts, Inc., on October 14, 1975. As was the case in the Ruby Means well contract, Roberts, Inc., paid plaintiff $20,000.00 upon the execution of the contract. During the drilling of the well, the drilling pipe became stuck, which caused a two-day delay in drilling. Roberts, Inc., at its own expense and pursuant to the terms of the contract, obtained the services of oil field service companies to free the pipe. After it was freed, plaintiff resumed drilling operations and drilled to contract depth. Drilling operations were completed on October 30, 1975. The well was dry. On November 6, 1975, plaintiff invoiced Roberts, Inc., for $26,544.92, the balance due for drilling the Emma Oates well.

The contract for the drilling of the H. L. & P. well was signed by plaintiff on October 31, 1975, and by Roberts, Inc., on November 3, 1975. Again, Roberts, Inc., paid $20,000.00 on the contract. The drilling operations were completed on November 14, 1975. The well was dry. On November 17, 1975, plaintiff invoiced Roberts, Inc., for $25,761.65, the balance due for the drilling of the H. L. & P. well.

Plaintiff's invoice for the balance ($36,-565.64) due for the drilling of the Ruby Means well was paid on December 18, 1975. However, Roberts, Inc., refused to pay the invoice balance ($26,544.92) due for the drilling of the Emma Oates well because it claimed that it was entitled to certain credits because of the negligence of plaintiff's drilling crews which caused the drill pipe to become stuck and for certain overcharges. Roberts, Inc., also refused to pay the invoice balance ($25,761.55) for the drilling of the H. L. & P. well because of asserted overcharges.

 The intent with which a person does an act is known to him and he is competent to testify as to such intent. Here, Roberts testified that "he did not have any secret intentions not to pay at any time." That statement is not disputed or contradicted by any direct evidence, and there is no circumstantial evidence which could possibly be considered as having any bearing on the question of Roberts' intent. Plaintiff, in its contention that there is circumstantial evidence which authorized the jury to infer that Roberts did intend to defraud plaintiff by making fraudulent representations and concealing material facts from it, in order to support the jury's answers to special issues 1 through 7, relies on: 1) Roberts' testimony that he "felt" that a "day-work" contract is "pretty close" to "rights to steal"; 2) following the completion of the Ruby Means well, Roberts orally promised to pay for all costs incurred by plaintiff in the drilling of the Emma Oates and H. L. & P. wells pursuant to "day-work" contracts; 3) Roberts' admission that be knew that the failure to pay the Ruby Means invoice in full might be grounds for the filing of a lien against the well which might tie up revenues from the producing well; 4) Roberts, after being dissatisfied with drilling operations on the Ruby Means well, and after being invited to

obtain another drilling contractor, decided to contract with plaintiff for the drilling of the other two wells; 5) Roberts did not tell plaintiff at the time the stuck drill pipe was freed that he intended to hold plaintiff accountable for the expenses of freeing the pipe because of the negligence of plaintiff's drilling crews; 6) Roberts first contended that he was entitled to $18,000.00 as a credit for plaintiff's negligence and overcharges, and at the trial asserted that he was entitled to more than $25,000.00 as a credit; and 7) except for the $20,000.00 advance, Roberts, Inc., never tendered or offered to pay plaintiff any amount of money for the drilling of the Emma Oates and H. L. & P. wells which it did not consider to be in dispute.

Concerning the oral promises to pay for the drilling costs of the Emma Oates and H. L. & P. wells, we first observe that such promises were made before the contracts for the drilling of the wells were executed. We next note that when the work was performed under the contracts, plaintiff was under a legal duty to perform such work and defendants were under the same duty to pay for all work performed by plaintiff under such contracts. Plaintiff's duty to perform such work arose out of the contract and not on his reliance on defendants' oral agreement to pay such charges. The contracts were valid when executed and they were not rendered invalid by any representations made after the date of their execution. See *Long v. Martin*, supra; *Burchill v. Hermsmeyer*, supra.

We do not consider that the foregoing constituted any circumstantial evidence from which the jury could reasonably infer that at the time Roberts signed the contracts for the drilling of the Emma Oates and H. L. & P. wells that "he then intended not to pay for a substantial part of plaintiff's charges for work performed on the well," as found by the jury in response to special issues 1 and 3; or that at the time plaintiff performed work on the wells, that it "relied on Mr. Roberts' agreement to pay when due plaintiff's charges for such work," as found by the jury in answer to special issues 2 and 4; or that Roberts

concealed from plaintiff his intent to charge plaintiff with the costs incurred in freeing the stuck pipe, as found by the jury in response to special issue 5; or that had such intent not been concealed, it would likely have affected the judgment and performance of plaintiff under the respective contracts. Such inferences could only be based upon pure speculation, surmise and conjecture.

The contention made by plaintiff that Roberts, at the time he orally promised to pay for the costs incurred by plaintiff in the drilling of the Emma Oates and H. L. & P. wells, had no intention to pay for *all* such costs, amounts to no more than a statement of plaintiff's opinions or conclusions concerning Roberts' state of mind. It is not evidence which raises an issue of fact as to whether there was any fraud. *Williamson v. Lewis*, 346 S.W.2d 957 (Tex.Civ.App.— Fort Worth 1961, writ ref'd); *Medina v. Sherrod*, supra.

There is no evidence which will support any inference of the commission of an independent tort in connection with a breach of contract.

There are no findings by the jury that Roberts' acts, representations or concealments were wanton, wilful or malicious, or that they were intentionally committed for the purpose of injuring plaintiff. Those facts are not conclusively established by the evidence. Therefore, plaintiff's motion to disregard the jury's answers to special issues 1 through 8 should have been sustained. In that state of the record, it was improper to award plaintiff a recovery of $52,306.57, as actual damages in the tort action, and $22,500.00 as punitive damages. Point 1 is sustained.

Defendants contend in point 6 that the court erred in awarding plaintiff $52,306.57 as actual damages because no issue on damages was submitted to the jury. The point has no merit.

██ Under Rule 279, T.R.C.P., the trial court is required to submit the controlling issues made by the pleadings and evidence. The trial court is not required to submit any

issue on matters which are not in dispute. *Marburger v. Jackson,* 513 S.W.2d 652 (Tex. Civ.App.—Corpus Christi 1974, writ ref'd n. r. e.); *Dozier v. Jarman,* 254 S.W.2d 569 (Tex.Civ.App.—Amarillo 1952, no writ).

 In this case, the total amount of invoices submitted by plaintiff to Roberts, Inc., was in the said amount of $52,306.57. Roberts, in his challenge to the total amount of the invoices introduced evidence in support of defendants' claims *for offsets* because of overcharges and negligence. Issues pertaining to all of such claims were submitted to the jury, and the jury failed to find that Roberts, Inc., was entitled to any offsets or reduction in plaintiff's invoices respecting the Emma Oates and H. L. & P. wells for overcharges. The jury further failed to find that plaintiff's drilling crews were negligent in causing the drilling pipe to be stuck during the drilling operations of the Emma Oates well. Since Roberts admitted that the amount of money due and owing plaintiff was the sum of $52,306.57, less such credits as he might establish·because of overcharges and negligence of plaintiff's drilling crews, and since the jury failed to find that Roberts, Inc., was entitled to any amount of money for such credits, the only possible mathematical result was that plaintiff was entitled to recover its total invoices' balance of $52,306.57. No issue on damages was required to be submitted to the jury. Point 6 is overruled.

Defendants assert in their point 3 that the trial court erred in reforming the contracts which were involved because there was no evidence to show that there was a meeting of the minds to warrant such reformation. The trial court in its judgment expressly denied "plaintiff's prayer for reformation of the contracts based on the jury's answers to special issues numbers 10 and 11." No error is presented for the reason that the trial court did not reform the contracts. Point 3 is overruled.

In point 4, defendants claim that the court erred in overruling defendants' motion for a directed verdict for the reason that the contracts showed on their faces that each was usurious as a matter of law.

Each of the contracts for the drilling of the Emma Oates well and the H. L. & P. well consisted of printed forms with appropriate blanks therein. Each form contained a printed provision that any sum or sums of money not paid within 30 days after due date should bear interest at the rate of "1½% per _____." The aforesaid blank was filled in with the words "30 days." Plaintiff urged that it was the intent of the parties that the rate should have been "per month" rather than "30 days," and due to the inadvertence, clerical mistake and bona fide error, the words "30 days" were inserted in the blank rather than the word "month," and that such trifling discrepancy was within the rule of *de minimus non curat lex.* Defendants contend that the interest at the rate of 1½% per 30 days, under the express provision of Tex.Rev.Civ. Stat.Ann. art. 1302–2.09 (Supp.1978), is usurious as a matter of law, because the interest contracted for is interest at the rate of 18.25% per annum, since there are 12.1667 30–day periods in a 365–day year.

 The jury found that the insertion of the words "30 days" in the printed form contract was "the result of a good faith error on the part of plaintiff" and further found "that the parties intended, at the time of the execution of the contracts that the interest provision would be for interest at the rate of 1.5% per month." Tex.Rev. Civ.Stat.Ann. art. 5069–1.06 (1971) provides that where the interest contracted for is greater than the amount authorized by law that there shall be no penalty for a violation which results from an "accidental and bona fide error." The evidence shows that Tomlinson testified that the plaintiff corporation was not engaged in lending money and had never collected interest from anyone; that the blank was actually filled in by his clerical employee, that he (Tomlinson) was attempting to charge 18% simple interest, which is 1½% per month and did not distinguish between a "month" and "30 days," and that he did not intend to charge interest in excess of 18% per annum. Roberts testified that when he signed the contract he did not look at the interest provi-

sion "specifically"; that he intended to accept whatever plaintiff put in there for interest for late payments; that he knew plaintiff did not want interest but did want their money when the same became due. The facts in this case support the jury's findings. See *Guetersloh v. C.I.T. Corporation,* 451 S.W.2d 759 (Tex.Civ.App.—Amarillo 1970, writ ref'd n. r. e.). Point 4 is overruled.

■ Defendants further say that the court erred in awarding attorneys' fees of $20,000.00 for the reason that such is an excessive award under the evidence. We do not agree.

The parties stipulated that the attorneys for plaintiff expended a total of 334 hours in the trial of this case. Plaintiff produced testimony to the effect that a contingent fee of 40% of recovery would be a reasonable fee in this case, and further presented evidence that a reasonable hourly rate for an attorney's services in cases of this kind is $75.00 per hour. A witness called by defendants testified that $60.00 per hour was a reasonable hourly charge for attorney's fees in Wharton County, Texas, where this case was tried. The jury found that the reasonable value of the services of plaintiff's attorneys in this case is $20,000.00. Applying either the 40% of recovery, the $75.00 per hour or the $60.00 per hour rates to 334 hours amounts to more than $20,-000.00. The evidence amply supports the award of the jury. The amount awarded is not excessive or unreasonable under the record here presented. Point 5 is overruled.

■ Finally, defendants claim in point 2 that the court erred in rendering judgment against Roberts, individually, for the reason that there was no evidence to justify invoking the alter ego doctrine. We agree.

Plaintiff pled an alter ego liability of the defendant Roberts for the debts of the corporate defendant Roberts, Inc. The evidence showed that the stock of the corporate defendant Roberts, Inc., is wholly owned by Roberts, his wife and his daughter; that all of the earnings of the corporation are reported as earnings of the shareholders; and that Roberts personally made all the decisions for the corporation.

Roberts, in answer to questions concerning whether he considered himself personally responsible for the contracts made by Roberts, Inc., said:

"Q Do you consider yourself personally responsible for the contracts of the corporation which are made?

A I feel like the corporation stands on its own. I do sign as chief executive officer.

Q Do you consider yourself personally responsible for the dealings that the corporation makes through you?

A I feel like that I am, yes."

\* \* \* \* \* \*

"Q Do you believe when people deal with you and you put your William B. Roberts, Inc. down on the contract and they are dealing with you, do you believe because of your control of this corporation that you are personally liable for the obligations that you have contracted on behalf of this corporation, do you believe that?

A I believe that.

Q Is that your position?

A Yes."

Plaintiff argues that the foregoing statements constitute a judicial admission that Roberts, Inc. was the alter ego of Roberts. In effect, it further argues that there was no need for it to offer proof with respect thereto since the judicial admission made it unnecessary to go forward with proof. Defendants dispute plaintiff's contention that such statements amount to a "judicial admission," and further say that there is no evidence which will support the trial judge's conclusion that the evidence showed conclusively that Roberts, Inc., was the alter ego of Roberts as a matter of law. No issue relating to alter ego was submitted to the jury.

■ We first address the issue of whether the aforesaid statements by Roberts constituted a judicial admission that Roberts, Inc., was his alter ego. The re-

quirements for statements to be held "judicial admissions" are set out in *United States Fidelity & Guaranty Co. v. Carr*, 242 S.W.2d 224, 229 (Tex.Civ.App.—San Antonio 1951, writ ref'd). Those requirements, in summary, are: 1) the statement must be made during the course of a judicial proceeding; 2) it must be contrary to an essential fact or defense asserted by the person giving the testimony; 3) it must be deliberate, clear and unequivocal; 4) the giving of conclusive effect to the statement must be consistent with public policy upon which the rule is based; and, 5) the statement is not also destructive of the opposing party's theory of recovery. We hold that the aforesaid statements by Roberts do not constitute a judicial admission that the corporation was his alter ego. He testified that he did not consider that he was personally responsible for the contracts which the corporation made when he said: "I feel like the corporation stands on its own"; later he testified that he did consider that he was personally liable under such contracts. The effect of all such testimony amounts to an equivocation and does not meet the requirement that the statement be clear and unequivocal. Moreover, the fact that Roberts did state that he considered himself personally liable for the corporation's contractual obligations, without more, will not constitute a judicial admission that the corporation is his alter ego.

■ The legal concept of a corporation as an entity separate and distinct from its stockholders, officers and directors is fundamental in the law of corporations. In the absence of some exception, neither the officers nor the directors of a corporation are personally responsible for the debts of the corporation. See 14 Tex.Jur.2d, Corporations, § 1013, pp. 122–136.

■ In order to establish personal liability for the acts of a corporation under the alter ego doctrine it is necessary to show that the directors of the corporation disregarded the corporate entity, which, in essence, made it nothing more than a mere conduit or vehicle for the transaction of private business of those sought to be charged with personal liability and that the separateness of the corporation apart from such individuals, did, in fact, cease to exist. See *Manney & Co. v. Texas Reserve Life Ins. Co.*, 407 S.W.2d 345 (Tex.Civ.App.—Dallas 1966, no writ).

■ The courts of this State are reluctant to pierce the corporate veil and impose personal liability upon an individual, such as its chief executive officer and controlling stockholder, and thereby destroy an important fiction under which so much of the business of the country is conducted, and will do so only under compelling circumstances. In order to disregard the corporate entity and to impose individual liability under the alter ego doctrine, it is well established that the proof must show one or more of the following: 1) that the individual (individuals) sought to be charged with personal liability for the acts of the corporation is (are) using the corporate entity to perpetrate a fraud, or to avoid the effect of a statute, or to evade an existing obligation, or to protect crimes, or to achieve or perpetrate a monopoly, or to justify a wrong; 2) that the individual who controls the corporation and manages its business affairs does so in such a manner whereby individual or corporate creditors may be deprived of their legal rights by a shuffling of the legal personalities of the corporation and its controller to the extent that the corporation is, in fact, the alter ego of the controller; 3) that the corporate formalities were not adhered to by the corporation in connection with the matters in question; and 4) that the corporation was inadequately capitalized. *Pace Corporation v. Jackson*, 155 Tex. 179, 284 S.W.2d 340 (1955); *Hanson Southwest Corp. v. Dal–Mac Construction Co.*, 554 S.W.2d 712 (Tex.Civ.App.—Dallas 1977, writ ref'd, n. r. e.); *Sutton v. Reagan & Gee*, 405 S.W.2d 828 (Tex.Civ.App.—San Antonio 1966, writ ref'd, n. r. e.); *Angus v. Air Coils, Inc.*, 567 S.W.2d 931 (Tex.Civ.App.—Dallas 1978, no writ); *Holmes v. Clow*, 553 S.W.2d 99 (Tex.Civ.App.—Tyler 1976, no writ). Moreover, the corporate entity may not be disregarded unless it is shown that the separateness of the corpora-

tion has ceased and the facts are such that adherence to the fiction would, under the particular circumstances, sanction a fraud or foster an injustice. *Gentry v. Credit Corporation of Houston,* 528 S.W.2d 571 (Tex.Sup.1975); *First Nat. Bank in Canyon v. Gamble,* 134 Tex. 112, 132 S.W.2d 100 (1939, opinion adopted); *State v. Swift & Co.,* 187 S.W.2d 127 (Tex.Civ.App.—Austin 1945, writ ref'd); *Pacific American Gasoline Co. of Texas v. Miller,* 76 S.W.2d 833 (Tex. Civ.App.—Amarillo 1934, writ ref'd).

The fact that a majority or even all of the stock in a corporation is owned by a single individual does not of itself constitute the corporation the alter ego of the individual. *Kroger Company v. J. Weingarten, Inc.,* 380 S.W.2d 145 (Tex.Civ.App.— Houston 1964, writ ref'd n. r. e.); *Evans v. General Insurance Company of America,* 390 S.W.2d 818 (Tex.Civ.App.—Dallas 1965, no writ).

The evidence conclusively showed that Roberts, Inc., had been in existence for four years prior to the transactions made the subject of this lawsuit; that it had a good reputation and had always complied with the laws of this State. It is undisputed: 1) there were no commingling of personal funds of Roberts and those of Roberts, Inc.; 2) the contracts in question were contracts between Roberts, Inc., and the plaintiff corporation; and 3) the contracts were understood by the executive officers of the two corporations involved to be contracts by and between the corporations and no one else.

Concerning the purposes for which Roberts, Inc., was formed, there is no evidence that Roberts, or anyone else, was motivated by bad faith when the corporation was organized in 1971, nor is there any evidence that the corporation was formed for the purpose of promoting or perpetrating fraud or injustice on anyone. With respect to its activities since the date Roberts, Inc., came into being, there is no evidence: 1) that Roberts, Inc., was inadequately capitalized; 2) that corporate formalities were not observed or that corporate accounts separate from those of Roberts were not kept; 3) that Roberts, Inc., was financially weak; 4)

that Roberts, at any time, was given preferred status as a creditor of Roberts, Inc., over any other creditors in the payment of the corporation's debts; 5) that any creditor of Roberts, Inc., was dealt with in an unfair manner; 6) that Roberts, Inc., was insolvent; 7) that Roberts, Inc., had ceased to do business subsequent to the drilling of the aforesaid wells; 8) that Roberts manipulated the business affairs of Roberts, Inc., in such a way as to interpose the separate identity of the corporation to insulate himself from personal liability; or 9) that there was any transfer of any asset of Roberts, Inc., to Roberts. In short, there is no evidence that Roberts used Roberts, Inc., fraudulently, or to promote an injustice; nor is there any evidence that plaintiff was the victim of some basically unfair device by which the corporate form of business organization was used to achieve an illegal or inequitable result. There was no showing that placed plaintiff in a position of disadvantage because of his dealings with Roberts, Inc., which, admittedly was controlled by Roberts, the dominant officer and stockholder in the corporation. No reason is revealed by the record which justifies the piercing of the corporate veil.

As has been noted, there is no jury finding in this case that the corporation was the alter ego of Roberts, and there is no evidence which justifies a conclusion as a matter of law that Roberts was using the corporation to defraud anyone, defendants or other persons. Plaintiff was fully aware of the financial and business structure of Roberts, Inc. Plaintiff chose to contract solely with the corporation. There is no basis for the judgment against Roberts, individually. Point 2 is sustained.

That portion of the judgment which held Roberts liable individually is reversed and judgment is here rendered that plaintiff take nothing against William B. Roberts individually. That portion of the judgment which decreed a recovery of $22,500.00 as punitive damages is reversed and judgment is here rendered that plaintiff take nothing on its action to recover punitive damages. The remaining portions of the judgment,

whereby it was decreed that plaintiff recover of the defendant William B. Roberts, Inc., the sum of $52,306.57, the balance due on the contracts sued on, plus interest thereon at the rate of 6% per annum from and after December 1, 1975, until the date the judgment was signed, and the additional sum of $20,000.00 as attorneys fees, together with interest on the total of such sums from the date judgment was signed until paid at the rate of 9% per annum, is affirmed. Therefore, since the amount of punitive damages is deleted from the judgment, it is required that the judgment be modified by this Court; and, it is so modified and, as modified, it is decreed that McDrilling Company, Inc., take nothing by its action against William B. Roberts, individually, but that it recover of and from William B. Roberts, Inc., the total sum of $78,993.09, together with interest thereon from January 17, 1978, at the rate of 9% per annum until paid. Rule 434, T.R.C.P.

The costs of this appeal are taxed four-fifth (⅘ths) to defendant William B. Roberts, Inc., and one-fifth (⅕th) to plaintiff McDrilling Company, Inc.

REVERSED AND RENDERED IN PART, MODIFIED IN PART, AND, AS MODIFIED, AFFIRMED.