**UNITED STATES STEEL CORPORA-TION and N. M. Uranium, Inc., Appellants,**

**v.**

**Quortice E. WHITLEY, et al., Appellees.**

**No. 1868.**

Court of Appeals of Texas, Corpus Christi.

May 20, 1982.

Rehearing Denied June 25, 1982.

Charles G. King, Jack L. Harvey, Bracewell & Patterson, Houston, Robert D. Nogueira, Beeville, for appellants.

Ted D. Lee, Mark H. Miller, Gunn, Lee & Jackson, Inc., San Antonio, Clyde L. Wright, Jr., Alice, W. L. Hardwick, George West, Jeff Davis San Antonio, for appellees.

Before NYE, C. J., and UTTER and KENNEDY, JJ.

## OPINION

NYE, Chief Justice.

This is an appeal from a judgment which construed a uranium lease and awarded damages in accordance with the jury's verdict. Appellants and cross-appellees are United States Steel Corporation and N. M. Uranium, Inc. (hereinafter called U.S.S.). Appellees and cross-appellants are the Whitley family (hereinafter Whitleys). All parties have perfected limited appeals.

A review of the pertinent facts reveals the following: On March 4, 1969, a Uranium Mining Lease and an Assignment of Overriding Royalties covering 98.35 acres of land in Live Oak County, Texas, was executed between U.S.S. and the Whitleys. U.S.S., the lessor under the lease, received the right to exclusively mine uranium in return for paying royalties and overriding royalties to the Whitleys. At the time of the execution of the lease (1969), all commercial uranium mining was done by either shaft or strip mining methods. "In-situ leaching" was not a known method of recovering uranium at the time this lease was executed.

In 1978, U.S.S. decided to exercise its mining rights and locate an "in-situ leaching" pilot plant upon this tract. The record shows that "in-situ leaching" was the only method by which uranium was produced from the Whitley lease.

The present controversy arose over the construction of the royalty payment provision of the lease signed in 1969. The following lease provisions are pertinent:

"Lessee shall pay lessor a royalty for the leased substances mined by lessee from the Leased Premises and sold, or processed and sold, by or for Lessee, the total amount of which royalty shall be determined and computed as provided in the schedule marked Exhibit "A" attached hereto and made a part of this lease." (PX 1)

This exhibit provides that:

A. *Royalty for uranium-bearing ores*

For all uranium-bearing ores (i.e., mineral-bearing materials that are mined primarily for their uranium content) which are mined, saved and removed from the Premises by Lessee hereunder for sale or processing, the royalty reserved to Lessor shall be *ten per cent (10%) of the Mine Value of such ores in raw, crude form.*

For the purpose of computing such royalty to be paid for uranium-bearing ores, the Mine Value thereof shall be determined according to the following subparagraphs (i) and (ii) of this paragraph A.

(i) The Mine Value of uranium-bearing ores sold by Lessee in *raw, crude form* shall be the actual net proceeds received for such ores by Lessee after deducting the cost, if any, of transporting such ore from the mine to the point of sale.

(ii) The Mine Value of uranium-bearing ores which are not sold in their *raw form* but which are processed in a mill owned or controlled, wholly or partly, by Lessee or which are processed in a custom mill for Lessee, shall be determined from the following price schedule with the applicable adjustments provided hereunder:

| Grade of Ore (Uranium ($U_3O_8$) Assay) | Ore Value per Dry Ton |
|---|---|
| 0.10% $U_3O_8$ | $3.00 |
| 0.15 | 7.00 |
| 0.20 | 14.00 |
| 0.30 | 21.00 |
| 0.40 | 28.00 |
| 0.50 | 35.00 |
| 0.60 | 42.00 |
| 0.70 | 49.00 |
| 0.80 | 56.00 |
| 0.90 | 63.00 |
| 1.00 | 70.00 |

Based upon this lease, the Whitleys contend that yellowcake (produced from "in-situ leaching") is uranium-bearing ore in raw form or raw, crude form (as that term is used in the lease), thus entitling them to a royalty equal to ten percent (10%) of the proceeds received from the sale of yellowcake as set forth in paragraph A–(i). On the other hand, U.S.S. contends that yellowcake is not "uranium-bearing ore in raw, crude form," but is instead *processed uranium* from which the royalty should be calculated on the basis of the "Mine Value" table set out in paragraph A–(ii). They contend that the evidence adduced at trial conclusively establishes that yellowcake is not uranium-bearing ore and that all witnesses agree that yellowcake exists only after some processing. Both parties argue that the question which must be decided by this Court is whether or not yellowcake is uranium-bearing ore in raw, crude form. Both sides contend that the mining lease is unambiguous. The central issue that is to be decided then is: What was the intent of the parties as to how royalty was to be paid for uranium from "in-situ leaching" under the present lease? In researching this problem, we have found no cases directly in point; and neither of the parties have cited us to any.

The problem created by a lease which does not specifically contemplate "solution mining" is at what point the product is to be valued for royalty computation purposes. A uranium royalty provision which is silent about royalties on products by solution mining must be construed so that the conventional royalty terms may be interpreted to calculate royalties on the products of solution mining. "Leachates," "pregnant liquors," "pregnant slurries" and "precipitates" are terms used in solution mining, but they are neither ore nor concentrates, and were not used in the subject lease. Applying the conventional royalty provision involves ascertaining the intention of the parties by analogizing the solution mining technology and comparing it to conventional mining technology. See Alfers, *The Uranium Royalty Today,* 25 Rocky Mtn.Min.L. Inst. 19–1 (1979); Peterson, *The Uranium Royalty Provision: Its Evolution, Present Complexity and Future Uncertainty,* 22 Rocky Mtn.Min.L.Inst. 865 (1976).

In the present case, in order to review the intent of the parties, the following summary of facts is important. Mr. Jay Smith, an independent oil, gas and mineral operator who negotiated the Whitley lease in 1969, testified that the leases being obtained in 1969 were basically for strip mining and that at that time, "in-situ leaching" was not known as a commercial means of production. He described the lease between the Whitleys and U.S.S. as being a conventional mining lease that did not then anticipate "in-situ leaching." Smith stated, in relation to the royalty clause of the Whitley lease, that in an "in-situ leaching" operation, what is mined, saved and removed as the first salable product is yellowcake. When asked to interpret paragraph (i) of the exhibit, Mr. Smith stated that the rawest, crudest form in which uranium could be sold from an "in-situ leaching" process would be yellowcake. Smith further stated that in an "in-situ leaching" operation, there is no such thing as a dry ton ore. Following is a series of questions and answers from Mr. Smith's testimony:

Q: What is, referring to the parts in combination, the terminology "all uranium-bearing ores mined, saved, and removed," and also the terms "ores in raw crude form," and I direct your attention to the first Paragraph of Exhibit "A" of PX–1, what is the first form in which the uranium exists that would meet both of those requirements?

A: We're still talking in the frame of in situ leaching process?

Q: That's correct. That's correct.

A: I think it's yellowcake.

Q: Do you consider yellowcake to be a raw crude form?

A: Depends on how it's recovered. If it's recovered through in situ leaching processes, as I understand it, it or this slurry of it and chemicals are the first stage at which you would have anything that is salable.

\* \* \* \* \* \*

Q: Do you ever pay royalties based upon what is in the ground, that hasn't been removed?

A: No, not really.

\* \* \* \* \* \*

Q: Is it normal for a royalty owner to pay costs prior to the first stage of obtaining a marketable product?

A: No.

Q: And it is your testimony that yellowcake is the first marketable product form in situ leaching?

A: Unless there is a market for the slurry, and I'm not aware of it if there is.

Mr. Quortice Whitley testified that uranium in the yellowcake form was being produced and sold from his tract and that he did not know of any rawer, cruder form in which uranium was being sold from that tract. Mr. Whitley also testified that in 1969 strip mining was the means of producing uranium, and when strip mining was done, there would be a dry ton of ore on which royalties could be calculated under paragraph (ii) of the lease.

There was also testimony in the record from various landowners near the Whitleys who had leased their property for uranium to U.S.S. These individuals testified that "in-situ leaching" was being used to mine their uranium and that they were being paid on the basis of how many pounds of yellowcake had been sold.

The record shows that in "in-situ leaching," certain chemicals and water are injected into the ore-bearing formations or sands which contain the uranium. This causes the uranium to become soluble in the water. This water solution is pumped, along with the chemicals and minute particles of uranium, through the production wells. This solution is injected through an ion exchange column and several other stages in which impurities are removed. The solution at this stage is referred to as a "slurry." This slurry is dried and then drummed. There is no market value for the slurry, and it is only after the slurry is leached and dried that the product becomes salable as a dried product referred to as yellowcake. Yellowcake, while it has had some purification done to it in the process of "in-situ leaching," has no specific use today in this country. After the yellowcake leaves the "in-situ leaching" plant, it takes more than 1,000 additional steps to get it into a useable form. Therefore, mining by the process of "in-situ leaching" produces uranium in indiscernible quantities from the liquid that is pumped out of the ground, and when leached out, it is in a form then called "yellowcake" that can be sold.

If a contract is unambiguous, the Court's obligation is to interpret the contract from its four corners and apply the law. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193 (Tex.1962).

In construing this agreement, the cardinal rule of construction is to ascertain the intention of the parties as expressed in the instrument. *Nixon v. First State Bank of Corpus Christi*, 540 S.W.2d 817 (Tex.Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.). The agreement must therefore be construed in its entirety. Each part of that agreement must be considered with every other part to determine the effect of one part on another part. *Southland Royalty Company v. Pan American Petroleum Corp.*, 378 S.W.2d 50 (Tex.1964); *Steeger v. Beard Drilling, Inc.*, 371 S.W.2d 684 (Tex.1963).

A written instrument is not ambiguous if it is so worded that a court may give it a certain legal meaning or interpretation. *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154 (1951); *Remington Rand, Inc. v. Sugarland Industries*, 137 Tex. 409, 153 S.W.2d 477 (1941); *Lewis v. East Texas Finance Co.*, 136 Tex. 149, 146 S.W.2d 977 (1941).

It is clear from a reading of the lease contract that the parties intended to pay and receive royalties based on the first salable product that was in "raw, crude form" or "raw form." The rawest, crudest state of recovery from "in-situ leaching" is yellowcake, which is in raw, crude form. While it may be said that yellowcake from "in-situ leaching" plants has been "proc-

essed" to some extent, this type of preliminary processing (leaching) can also be compared in some degree to the processing done in strip mining. In strip mining, when the ore is taken from the earth, much overburden has to be removed before uranium ore in its mineral state can be found, mined and brought to the surface. After this "processing" has been done, the ore from the mine is hauled away to the mill for further processing.

Under the present lease (paragraph A–[i] ), the lessee is to be paid 10% of the mine value of the uranium ore sold in raw, crude form at the point of sale (less cost of transportation, if any). If the uranium ore is not sold in raw form, but is processed in a mill, the lessee is paid according to a price schedule set out in paragraph A–(ii). Here, the jury found that the yellowcake was uranium-bearing ore in raw, crude form. The record does not show that an "in-situ leaching" plant was a mill. Therefore, since the recovered uranium ore as dried yellowcake was in raw, crude form and not sold as processed ore from a mill, paragraph A–(ii) would be inapplicable.

■ By giving effect to each clause of the lease, it is clear to us that the parties intended that the royalty owners should be paid the mine value (10%) for their interest in the uranium-bearing ore recovered at the "in-situ leaching" plant (point of sale) under paragraph A–(i). We hold that the jury did not err in finding that yellowcake is uranium-bearing ore in raw, crude form as that term is used in the subject lease; nor was the trial court in error in entering judgment in accordance with the jury's findings.

After carefully reviewing all of the evidence from the entire record before this Court, we also find that such evidence does not conclusively establish an opposite or negative answer to special issue one and that the jury's answer to that issue is not so

contrary to the greater weight and preponderance of the evidence as to be manifestly wrong. See: *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 359 (1960). Appellants' points of error three and four are overruled.

■ In connection with the ambiguity, vel non, of the uranium lease, U.S.S. contends in its first and second points of error that the trial court erred in refusing to grant their motion for a partial summary judgment which sought to establish that the mining lease was unambiguous. We overrule this point because an order of the trial court overruling a motion for a partial summary judgment is interlocutory and therefore is not appealable after a trial on the merits. We, therefore, do not consider U.S.S.'s point complaining of the trial court's refusal to grant a partial summary judgment. *Ackermann v. Vordenbaum*, 403 S.W.2d 362 (Tex.1966); *Dickerson v. Mack Financial Corporation*, 452 S.W.2d 552 (Tex. Civ.App.—Houston [1st Dist.] 1970, writ ref'd n.r.e.).

U.S.S. next complains of the trial court's action in refusing to grant an instructed verdict at the close of the Whitleys' evidence. Based upon our holding in points of error three and four above, we find it unnecessary to consider this point. Accordingly, U.S.S.'s point of error two is overruled.

■ U.S.S. argues in its fifth point of error that the trial court erred in refusing to grant its motion for remittitur because the attorney's fees awarded by the jury were excessive.[1] Attorney's fees, where recoverable by law, must be reasonable under the particular circumstances of the case and must bear a reasonable relationship to the amount in controversy.[2] *Argonaut Ins. Co.*

---

1. The jury found that a reasonable amount for attorney fees through the trial court was $60,000; through the Court of Appeals, $15,000 additional; application for writ of error to Supreme Court, $10,000; and if granted, $5,000 additional.

2. The jury awarded $200,000 for the due diligence cause of action; $263,000 for the due diligence cause of action as to Quortice Whitley; and $8,100 in actual damages.

*v. ABC Steel Products*, 582 S.W.2d 883 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.). Although the amount of attorney's fees is a question of fact for the jury, the trial or the appellate court has the duty to reduce the fee awarded if it finds that it is excessive. With regard to excessiveness, attorney's fees are in the same category as a general award of damages. On appeal, findings by the jury will not be disturbed on the ground of excessiveness if there is any probative evidence to sustain the award. In disposing of a remittitur point of error as excessive, we must consider only the evidence that is favorable to the award. In determining whether the award is excessive, the reviewing court is entitled to call on the court's own common knowledge and experience as lawyers and judges. *Argonaut, supra; McFadden v. Bresler Malls, Inc.*, 548 S.W.2d 789 (Tex.Civ.App.—Austin 1977, no writ). See also: *William B. Roberts, Inc. v. McDrilling Company, Inc.*, 579 S.W.2d 335 (Tex.Civ.App.—Corpus Christi 1979, no writ). After a complete review of such evidence, and if the appellate court finds that the award shocks the conscience of the court, a remittitur is proper. *Browning v. Paiz*, 586 S.W.2d 670 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

In the present case, the evidence showed that the Whitleys' attorney had spent close to 600 hours on the case up until the time of the trial, an associate of his had spent approximately 300 hours, and his law clerks had spent over 300 hours in preparation for trial. There were 23 depositions taken, several pretrial hearings, and over 100 separate documents filed in connection with the trial. There was evidence in the record as to the approximated cost of appealing the case, both to the Court of Appeals and to the Supreme Court.

■ Having reviewed all of the evidence under the evidentiary standards set forth above, we find that there is ample evidence to support the award of the jury and that such amount is neither excessive nor unreasonable. Point of error number five is overruled.

In points of error six and seven, U.S.S. contends that the evidence established a negative answer to special issue eight, or that the answer to that special issue was against the great weight and preponderance of the evidence. This issue reads as follows:

"Do you find from a preponderance of the evidence that the Defendants failed to produce uranium from the 98-acre tract in question with due diligence?

You are instructed that the term "due diligence" as used in this Special Issue means such diligence as would have been used by an ordinary prudent operator engaged in the same or similar undertaking under the same or similar circumstances. Answer 'They failed' or 'They did not fail.'

Answer: They failed"

U.S.S. argues that the amount of due diligence required by a lessee in the mining of hard minerals is not nearly as great as that required in the mining of oil and gas. U.S.S. reasons that in the present case if the court looks at the lessee's activity in the entire area (other leases), the evidence reveals that they have been both diligent in producing minerals from the entire ore body in the surrounding area, and diligent in increasing production on the Whitley leasehold by improved solution mining methods.

■ The standard of care in testing the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and circumstances. Every claim of improper operation by a lessee should be tested against the general duty of the lessee to conduct operations as a reasonably prudent operator would on that particular lease in order to carry out the purpose of the lease in question. *Amoco Production Company v. Alexander*, 622 S.W.2d 563 (Tex.1981).

Though the application of this covenant is usually found in the context of an oil and gas lease, several early cases interpreted

the effect of the implied covenant on leases involving other minerals. In those cases, the implied covenant to reasonably develop took effect upon the discovery of minerals in paying quantities. These holdings indicate that the implied covenant to reasonably develop the mineral interests takes effect upon discovery of minerals in paying quantities. See this Court's reasoning in *Exxon Company v. Dalco*, 609 S.W.2d 281 (Tex.Civ.App.—Corpus Christi 1980, no writ) and the many cases cited therein. An implied covenant to reasonably develop uranium is not contingent upon actual production of the mineral. Even so, in the present case uranium was being produced in paying quantities, so the question of fact for the jury to consider was whether or not U.S.S., in effectuating this implied covenant, used due diligence. The jury found that "they failed." Therefore, our duty is to determine whether or not the jury's answer is supported by the evidence. In so doing, we are guided by the standard of review set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); and Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. 359 (1960).

In reviewing the evidence under these standards, the following facts are pertinent. Mr. Kenneth Herricks, production superintendent for field operations with U.S.S., testified that U.S.S. used pilot plants, not necessarily only on the Whitley property, but because they were in the early stages of developing expertise in the field of "in-situ leaching."

Q: So the Whitley property, then, was being used as the guinea pig for all of these tests for this particular area of U.S. Steel's operations in this area?

A: I wouldn't use "guinea pig." It just so happened because of the particular development we had going at that time, it was used because it was there and available to be used to run these particular tests.

Q: And it was the Whitley property on which you performed all these tests

for either the benefit of all the other leases around?

U.S.S. conducted tests on different leaching processes through the pilot plant on the Whitley lease, thus causing U.S.S. to switch back and forth from different patterns. Mr. Herricks testified that when there is a switching pattern, it takes time for a well to once again start producing at its peak production.

Herricks also testified that there were approximately eight acres of uranium represented on the "G.T. Map" of the Whitley property. (A "G.T. Map" is a map which shows the combination, grade and thickness of the $U_3O_8$ and the thickness of the ore body.) He further stated that it would take approximately 71 patterns to cover this eight acres of uranium ore. The average gallon per minute from a normally producing well is about 50 gallons per minute. Therefore, multiplying the 71 wells by 50 gallons per minute, there should have been approximately 3,550 gallons per minute flowing from the 71 well patterns. The gallon per minute capacity of the pilot plant being used on the Whitley property was only 90. The Whitley property also had the smallest producing patterns of any of U.S.S.'s properties. The evidence showed that other lessors in the Boots ore body had considerably more production patterns than the Whitley lease.

■ U.S.S. points out that the Whitleys argue that their tract should have been produced without regard to other tracts in the ore body at a time when the market price was high and without regard to the mining plan for the Boots ore body as a whole approved by the State. U.S.S. argues in effect that no uranium has been lost under the 98-acre tract and that it is still there to be produced. It is well settled that a lessee's responsibility to other lessors in the same field does not control. This lawsuit is between the Whitleys and U.S.S. on the lease agreement between them and the implied covenant to develop under this lease agreement. U.S.S.'s status as a common lessee does not affect its liability to the Whitleys. *Amoco Production Co. v. Alex-*

*ander, supra.* We hold that there is ample evidence to support the jury's answers to special issue eight. U.S.S.'s sixth and seventh points of error are overruled.

In points of error eight and nine, U.S.S. contends that the evidence is legally and factually insufficient to support the jury's answers to the special issues on damages concerning U.S.S.'s breach of its implied duty to reasonably develop. With respect to these issues, Mr. Hubbard testified to the estimated loss the Whitleys incurred as a result of the lack of due diligence associated with the production of uranium from the Whitley field. He arrived at his estimates by assuming a production rate of both 10,-000 pounds and 30,000 pounds per month.

 Hubbard testified that during the time period that this uranium could have been produced from the Whitley land, uranium was at its highest value, from October of 1978 until seven months later. For the six-month period preceding the trial, the price of uranium dropped drastically from $43.00 per pound to $28.50 per pound. There was considerable testimony that the various landowners in the same ore body next to the Whitleys were having a much greater rate of production. Reviewing all of the evidence in accord with the previously stated evidentiary review standards, we find that there is sufficient evidence, both legally and factually, to support the jury's answers to these special issues on damages. Accordingly, U.S.S.'s points of error eight and nine are overruled.

 In its last point of error, U.S.S. contends that the trial court erred in not disregarding the jury's answer to special issue eleven because there is no duty to produce uranium with due diligence as to the overriding royalty owner. It is well settled in Texas, with regard to oil and gas leases, that unless the assignment provides to the contrary, the assignor of an oil and gas lease impliedly covenants to protect the premises when the assignor reserves an overriding royalty. *Bolton v. Coats,* 533 S.W.2d 914 (Tex.1976); *Wes-Tex Land Company v. Simmons,* 566 S.W.2d 719 (Tex. Civ.App.—Eastland 1978, writ ref'd n.r.e.). Having previously held that there existed an implied covenant with regard to due diligence under the lease agreement, we find that Quortice Whitley is entitled to the benefit of the implied covenant of due diligence under his assignment as well.

However, U.S.S. argues that the assignment does not mention any duty on the part of the assignee to produce the mine in the 98-acre tract. To support this proposition, U.S.S. relies on the following language found in the assignment lease:

"It is expressly agreed that operations, if any, on said premises and the extent and duration thereof as well as the preservation of leasehold by rental payments or otherwise, shall be solely at the will of the assignor, its successors and assigns."

However, the assignment lease provision also contains the following: "... in the consideration of the sum of Ten ($10.00) Dollars to Assignor paid by Quortice E. Whitley, of Live Oak County, Texas, hereinafter called assignee, has bargained, sold, assigned and conveyed and by these presents does bargain, sell, assign and convey unto the said Assignee the following:

An undivided two and one-half (2½%) per cent overriding royalty interest in all uranium ores, ...

Lease from Q. L. Whitley, Individually and as Attorney in Fact, et al, as Lessor, and Baytex Oil Company, as Lessee, dated March 4, 1968, covering the following described land situated in Live Oak County, Texas, to-wit:

\* \* \* \* \* \*

TO HAVE AND TO HOLD SAID two and one-half per cent (2½%) overriding royalty interest so conveyed unto the said Assignee, his heirs and assigns, *subject to the terms of the above described lease* and subject also to the following." (emphasis added).

After reviewing this lease and the evidence in the record, we hold that the lease provision quoted by U.S.S. does not expressly provide that U.S.S. will not owe any implied duties to the overriding royalty

owner. U.S.S. cites the case of *Dancigre Oil & Refining Company of Texas v. Powell*, 137 Tex. 484, 154 S.W.2d 632 (1941). U.S.S. states that the Supreme Court in *Dancigre* refused to imply a duty of reasonable development extending from the grantee to the grantor in the conveyance of an interest in oil and gas where the grantee provided consideration of a downpayment in cash and a similar cash amount from future production and the grantor reserved a fractional interest in the oil and gas interest conveyed. After carefully reviewing the *Dancigre* case, we find it distinguishable because in *Dancigre* there was a *conveyance* of the minerals and not a lease. U.S.S.'s tenth point of error is overruled.

We next turn to the Whitleys' seven cross-points and their cross-appeal on attorney's fees. At the outset, we note that in their prayer for relief the Whitleys pray that "the judgment of the trial court be in all respects affirmed with the sole exception of the single and severable point of error raised in the prior filed 'Whitley Family's Brief of Appellants'," (the cross-appeal). Since the Whitleys have sought no relief under their cross-points, none will be granted. Rule 418, T.R.C.P. (1981).

Appellees Whitley contend in their cross-appeal that the trial court erred in holding that as a matter of law the Whitley family was not entitled to reasonable attorney's fees incurred under their due diligence cause of action. The Whitleys argue that their due diligence cause of action is a contractual cause of action of the type contemplated by Article 2226 and therefore, the trial court erred in refusing to submit the special issues concerning attorney fees.

In *Amoco Production Co. v. Alexander, supra,* at 571, the Supreme Court stated that:

"... a breach of the implied covenant to protect against drainage is an action sounding in contract...."

Whitleys' cause of action under an implied covenant of due diligence was a contract action which could support an award of attorney's fees under Article 2226, Tex.Rev. Civ.Stat.Ann. (Vernon 1979), *if properly presented.* The Whitleys argue that they have met the requirements of presentment by way of letters dated August 28, 1978; August 29, 1978; and August 31, 1978. These letters were all directed to U.S.S., demanding that they make proper payments of the royalties under the written lease and to the overriding royalty agreement. These letters do not make demand on U.S.S. to use due diligence in producing the uranium.

The purpose of presentment of a claim is to allow the person against whom it is asserted an opportunity to tender performance. No particular form of presentment is necessary. *Jones v. Kelley* 614 S.W.2d 95 (Tex.1981); *Hudson v. Smith*, 391 S.W.2d 441 (Tex.Civ.App.—Houston 1965, writ ref'd n.r.e.). While both the cause of action under the implied covenant of due diligence and the cause of action for proper payment of royalty arose under the same lease, they are *separate* causes of action. Accordingly, the Whitleys, in order to recover attorney's fees under art. 2226, had the burden of presenting their due diligence demand to U.S.S. This did not take place.

We hold that the trial court did not err in refusing to submit the special issue regarding attorney's fees as to the due diligence cause of action. The Whitleys' cross-appeal is overruled. Costs of the appeal are adjudged 50% against United States Steel Corporation and N. M. Uranium, Inc., and 50% against Quortice E. Whitley, et al.

The judgment of the trial court is affirmed.