Cynthia WOODS, individually and on Behalf of her minor children, Regina Joel WOODS and Trevor Neil Woods, Plaintiff-Appellee Cross-Appellant,

v.

INTERNATIONAL HARVESTER COMPANY, INC., Defendant-Appellant Cross-Appellee.

No. 81–3534.

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1983.

Bernard, Cassisa, Babst & Saporito, Paul V. Cassisa, Metairie, La., B. Jeff Crane, Houston, Tex., Seymour W. Croft, Senior Counsel, Chicago, Ill., for defendant-appellant cross-appellee.

Bagert, Bagert & McDonald, Bernard J. Bagert, Jr., New Orleans, La., John F. McDonald, III, Metairie, La., for plaintiff-appellee cross-appellant.

Before GOLDBERG, GEE and HIGGIN-BOTHAM, Circuit Judges.

GOLDBERG, Circuit Judge:

This is an appeal from a jury verdict for the plaintiffs in a diversity case from Louisiana. The action was for redhibition, under La.Civ.Code Ann. art. 2545, alleging that plaintiffs' decedent was killed by a defect in his International Harvester Scout II.

The Scout II is a vehicle designed and promoted for use over terrain wilder than asphalt. In particular, it can travel through a greater depth of water than normal passenger vehicles can withstand, though not without limits. The exhaust pipe terminates inside the rear wheel well. At water levels below twenty-five inches this causes no problems; at water levels above thirty-two inches the motor quits. At water levels between twenty-five and thirty-two inches, the exhaust gases are trapped in the wheel well. In less than a minute, lethal carbon monoxide can pass through holes in the wheel well and fill the passenger compartment.

Plaintiff's decedent, Mr. Woods, owned a Scout II. On May 3, 1978, heavy rain flooded New Orleans. Mr. Woods used his Scout II to take a friend home and then headed toward his own home. He never made it there. He later was found in his Scout II, dead from carbon monoxide poisoning.

On March 16, 1979, plaintiff, Cynthia Woods individually and on behalf of her two minor children ("Woods"), filed a complaint against International Harvester ("IH"), manufacturer of the Scout II, in United States District Court for the Eastern District of Louisiana. After lengthy discovery, a jury trial was held from February 5 to February 12, 1981. The jury found that Mr. Woods' Scout II was defective and that the defect caused his death and fixed damages at $890,703. A final judgment was entered on September 1, 1981, awarding damages and attorney's fees to Woods.

On appeal IH raises four issues. First, IH argues that the court should have directed a verdict in its favor on the issue of liability. Second, IH claims it was prejudiced by Woods' tardy disclosure of the substance of one of her expert witnesses' testimony. Third, IH contends it was prejudiced by the admission of the testimony of two witnesses. Fourth, IH argues that the award of attorney's fees according to Louisiana law violates due process. Woods cross-appeals claiming that the quanta of attorney's fees awarded was too small. We shall treat these arguments in turn.

## I. JURY VERDICT

IH's first point on appeal is that reasonable jurors could not have found that the Scout II design was defective.

A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.

*Weber v. Fidelity & Casualty Insurance Co.,* 259 La. 599, 250 So.2d 754, 755 (1971). The test, initially, is whether the product was "unreasonably dangerous to normal use." In this context, however, the phrase "normal use" does not take on its everyday meaning. For example, in a similar case the Fifth Circuit found that driving a sports car on a highway at a speed over 100 MPH was "normal use."

Certainly the operation of the Cougar in excess of 100 miles per hour was not "normal" in the sense of being a routine or intended use. "Normal use," however, is a term of art in the parlance of Louisiana products liability law, delineating the scope of a manufacturer's duty and con-

sequent liability; it encompasses all *reasonably foreseeable* uses of a product. *See, e.g., Rey v. Cuccia,* 298 So.2d 840, 844 n. 2, 845 (La.1974) (duty to warn of "possible hazard" known to manufacturer); *Amco Underwriters of the Audubon Insurance Co. v. American Radiator & Standard Corp.,* 329 So.2d 501, 504 (La.App. 1976) (duty to warn of dangers even from improper use of otherwise non-defective product). See also, e.g., *Jones v. Menard,* 559 F.2d 1282, 1285 n. 4 (5th Cir.1977) (dictum, construing Louisiana law to the effect that "[i]n inadequate warning cases misuse means that the seller had no duty to warn against unforeseeable uses of its products, while in design cases misuse means that the manufacturer had no duty to design a product so as to prevent injuries from unforeseeable uses of that product"). The sports car involved here was marketed with an intended and recognized appeal to youthful drivers. The 425 horsepower engine with which Ford had equipped it provided a capability of speeds over 100 miles per hour, and the car's allure, no doubt exploited in its marketing, lay in no small measure in this power and potential speed. It was not simply foreseeable, but was to be readily expected, that the Cougar would, on occasion, be driven in excess of the 85 mile per hour proven maximum safe operating speed of its Goodyear tires. Consequently, Ford cannot, on the basis of abnormal use, escape its duty either to provide an adequate warning of the specific danger of tread separation at such high speeds or to ameliorate the danger in some other way.

*LeBouef v. Goodyear Tire & Rubber Co.,* 623 F.2d 985, 989 (5th Cir.1980). For the purpose of this case, the issue of whether the Scout II was defective resolves into whether a jury could have found that it was "reasonably foreseeable" that the Scout II would be operated in water between 25 and 32 inches for a minute, leading to Woods' asphyxiation.

 In determining whether a jury could find that this use was "reasonably foreseeable," we are guided by the standard enunci-

ated by this Court in *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

We find that the evidence and reasonable inferences from the evidence do support the jury verdict.

Three factors support the jury's finding that the use of the Scout II that led to Mr. Woods' death was reasonably foreseeable by IH. First, IH designed and promoted the Scout II as being operable in water deeper than that in which normal passenger vehicles could operate. *See, e.g.,* Exhibit IH–17 (lubrication instructions contemplating operation in "DEEP WATER"); Exhibit P–3 (advertisement showing Scout II traveling through water); Exhibit P–17 (same); Ex-

hibit P–25 (same); Exhibit P–19 (same). Given this, the jury could have found it reasonably foreseeable that someone would drive the vehicle in any depth of water in which it could be driven. Second, some testimony indicated the Scout II could be driven, albeit with difficulty, in water deep enough to cause carbon monoxide to enter the passenger compartment. Woods' expert witness, Dr. Hal K. Watson, testified that "[i]f he was going to drive in that deep water [twenty-nine inches], he would have to be going very slowly." Record at VI–148. Third, Mr. Woods did in fact drive his Scout II into the conditions that led to his death. This is surely conclusive evidence that the vehicle *could* be used in water in a way leading to the death of an occupant.

Being mindful of the admonitions in *Boeing,* we believe that taking into account the whole of the evidence and the inferences most favorable to Woods, a reasonable jury could have found that the use of the Scout II leading to Mr. Woods' death was reasonably foreseeable.

## II. TESTIMONY OF DR. WATSON

IH's second argument on appeal is that it was prejudiced by untimely discovery of the substance of the testimony of Dr. Watson, who was one of Woods' two expert witnesses testifying on the design of the Scout II.[1] IH's main complaint is that it did not have any knowledge of the substance of Dr. Watson's testimony until December 9, and could not depose Dr. Watson until February 2, five days before trial. Because one of the purposes of the Federal Rules of Civil Procedure is to eliminate "trial by ambush," IH argues, the trial judge erred in denying a continuance or, in the alternative, excluding Dr. Watson's testimony.

We certainly agree that trial by ambush is not contemplated by the Federal Rules of Civil Procedure. On the other hand, the trial judge has great discretion in admitting evidence and granting continuances, which we will not lightly disturb. *See, e.g., Crompton-Richmond Co. v. Briggs,* 560 F.2d 1195, 1202 (5th Cir.1977). More significantly, we do not see any prejudice to IH on this record. Dr. Watson's testimony was substantially similar to the testimony of Dr. Liebkmann, another Woods expert witness, of whom IH had ample advance notice. Furthermore, even given the abbreviated time frame, IH was able to depose Dr. Watson, perform rebuttal tests of its own, and cross-examine Dr. Watson exten-

1. The chronology of events is as follows:

(1) Trial was originally scheduled for July, 1980. There was an order requiring parties to "procure and exchange" written reports of experts no later than May 2, 1980. Appellee Woods failed to comply with this order and the trial court rescheduled trial for February 5, 1981, with a new discovery cutoff of December 1, 1980.

(2) June, 1980—Dr. Watson completed tests on the Scout II.

(3) June 30, 1980—Woods listed Dr. Watson as a "may call" witness; this was the first mention of Dr. Watson to IH.

(4) September, 1980—IH, by interrogatory, requested copies of all expert witness reports of Woods; this imposed a continuing duty to produce the reports. At that time, Dr. Watson's report was not ready.

(5) December 1, 1980—IH filed notice of deposition of Dr. Watson; because of Dr. Watson's schedule, the deposition could not be taken before January 23, 1981. December 1, 1980 was the date the trial judge had set for cutoff of discovery.

(6) December 9, 1980—Woods identified Dr. Watson as a "may call" witness and synop-

sized his opinion. This was IH's first notice of the substance of Dr. Watson's testimony.

(7) January 6, 1981—Woods showed IH's *counsel* a film prepared by Dr. Watson, but did not allow IH to take or copy the film.

(8) January 20, 1981—IH began conducting its own tests, which were filmed.

(9) January 25, 1981—IH received a copy of Dr. Watson's report.

(10) January 27, 1981—Woods showed the film to IH's experts and technical staff.

(11) January 30, 1981—IH moved that the court exclude Dr. Watson's testimony or in the alternative, grant a continuance. The judge denied the motion and ordered "Appellees to arrange for Watson's testimony as soon as possible" and furnish a copy of the film.

(12) February 2, 1981—IH deposed Dr. Watson.

(13) February 3, 1981—Woods deposed IH's experts; Woods was not advised that IH had conducted its own tests and made its own film.

(14) February 5, 1981—Trial begins, IH cross-examines Dr. Watson and rebuts his testimony with its own experiments and film.

sively at trial. Accordingly, even if the trial judge's actions were error, we could not hold them to be reversible error.

## III. RYAN, FOX, AND THE SEASHORE TAPE

IH's third point of error relates to the admission of the deposition of Mr. Ryan, the testimony of Ms. Fox, and a videotape of an IH Scout II commercial. Mr. Ryan was involved with the advertising campaign for the Scout II. In his deposition he was shown four videotapes of Scout II commercials. The first three he said were labeled as having been displayed. The fourth he said was labeled as not having been televised.

Though Mr. Ryan was not listed as a witness in the pretrial order, the court granted Woods' request to admit deposition testimony. At the time Ryan's deposition was read, the court allowed the first three tapes into evidence, but not the fourth. After the close of IH's defense, Woods called Ms. Fox, who was not listed as a witness. She worked for IH's advertising firm and testified that the fourth tape had in fact been broadcast, so the trial court admitted the fourth tape into evidence.

■■■ As Woods cogently argues, Ryan's testimony was relevant because it shows how IH marketed the Scout II, which shows how IH foresaw the Scout II would be used. IH was aware of Ryan's deposition months before trial and was not prejudiced by its introduction despite Ryan's omission from the witness list. The fourth tape, the seashore tape, showed a Scout II splashing through water along a seashore and could be quite important to showing foreseeability of use of the Scout II in water deeper than normal vehicles could tolerate. The trial court originally excluded the fourth tape because IH objected that Ryan's deposition indicated it had never been shown. Thus, the decision to admit Ms. Fox's testimony that that tape *had* been shown was a decision within the trial court's discretion to admit rebuttal testimony. Once Ms. Fox established the predicate that the tape had been shown, the tape was appropriate evi-

dence of IH's marketing strategy and of whether deep water use was foreseeable by IH.

We find no error in any of the trial court's rulings on these matters. *See, e.g., Miller v. Universal City Studios, Inc.,* 650 F.2d 1365 (5th Cir.1981); *Young v. Illinois Central Gulf Railroad Co.,* 618 F.2d 332 (5th Cir.1980).

## IV. ATTORNEY'S FEES

Louisiana Civil Code art. 2545 allows award of attorney's fees when a seller knows of the flaw in a product and fails to disclose it. The Louisiana Supreme Court has imposed upon a manufacturer a presumption of knowledge of defects, and has applied article 2545 to award attorney's fees in products liability actions without showing actual knowledge. *Rey v. Cuccia,* 298 So.2d 840 (La.1974).

Woods amended her complaint to request attorney's fees. Her arrangement with counsel provided for a thirty-five percent contingent fee. The trial court held a hearing on reasonable attorney's fees and ruled that a reasonable fee was determined by allowing a certain amount of hours billed times a reasonable hourly rate. Both parties appeal from this ruling.

■■■ IH argues that the Louisiana Supreme Court's interpretation of Louisiana law violates due process under the fourteenth amendment of the United States Constitution. We see nothing in the Louisiana Supreme Court's interpretation that would violate the federal constitution, and as a federal court sitting in diversity, we are bound by a state's construction of its laws. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Woods cross-appeals on the quanta of attorney's fees, arguing that the trial court should have awarded attorney's fees in the amount provided in the contingency fee agreement between Woods and her attorneys. Woods argues that the point of article 2545 is to place injured consumers in as good a position as they would have been absent the injury. Thus, because the con-

tingency fee arrangement was reasonable, the court should have awarded attorney's fees in that amount.

Again, as a federal court sitting in diversity, we are bound by the state's construction of its statutes. The trial court relied on *Artigue v. Louisiana Farm Bureau Mutual Insurance Co.,* 339 So.2d 880 (La.App. 1977) (construing La.Rev.Stat.Ann. § 22:658), which held that the trial court should make an after-the-fact determination of what quanta of attorney's fees would be reasonable.

Our review of the cases under article 2545 does not reveal any speaking precisely to whether contingency fee arrangements will be enforced, but does show many cases approving awards based on an after-the-fact determination of what amount would be reasonable under all the circumstances. *See, e.g., Cox v. Moore,* 367 So.2d 424, 426 (La.App.1979) ("The award of attorney's fees was based on time expended and not on the amount of the award and was within the lower court's discretion."). *See also Harris v. Bardwell,* 373 So.2d 777, 784 (La.App.1979); *Clinkscales v. Superior Pontiac-GMC, Inc.,* 365 So.2d 895, 898 (La.App.1978). In general, Louisiana courts hold that "[i]n making awards for attorney's fees, the trial court is vested with considerable discretion, the exercise of which will not be interfered with save in a clear case of abuse." *State v. Terrebonne,* 349 So.2d 936, 940 (La.1972) (construing La. Rev.Stat.Ann. § 48:453(E)). Whether or not we would have enforced the contingency fee agreement, we cannot say the trial court's procedure was a "clear case of abuse."

### CONCLUSION

The judgment below is in all matters AFFIRMED.

GEE, Circuit Judge, concurring:

I concur in the court's opinion, adding only that although I consider application of the Louisiana rule presuming notice of a defect in an article's manufacturer to subject him to attorneys' fees as one who knows of defects and fails to disclose them to be egregiously unjust, I cannot find it unconstitutional. Since the same result could have been obtained by a state law requiring losing manufacturers to pay attorneys' fees without regard to their knowledge of defects, I doubt that due process is offended. *See Usery v. Elkhorn Mining Co.,* 428 U.S. 1, 23–4, 96 S.Ct. 2882, 2896–2897, 49 L.Ed.2d 752 (1976).