**Eugenio RIQUELME VALDES, Plaintiff,**

**Inmobiliaria Kan Kun, S.A., Plaintiff-Appellee,**

v.

**LEISURE RESOURCE GROUP, INC., Capitol Savings & Loan Association and United Service Corporation, Defendants-Appellants.**

**No. 86–1124.**

United States Court of Appeals, Fifth Circuit.

Feb. 25, 1987.
Rehearing Denied March 27, 1987.

---

Michael G. Mullen, Wayne Prescott, Austin, Tex., for Leisure Resource Group, Inc.

Gary E. Zausmer, T.B. Wright, Austin, Tex., for Capitol Sav. & United Service Corp.

Robert N. Hinton, Alan Magenheim, Charles W. Getman, Houston, Tex., for plaintiff-appellee.

Before JOLLY, HILL, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This case illustrates, at several levels, the manifest wisdom of doing business in familiar localities with people of proven ability. A Mexican company secured a judgment for over $10 million for fraud committed by an Austin resort timeshare business, run by promoters from Malibu,

California. Liability was extended by conspiracy and corporate alter ego theories to the defendant's Iowa-based lenders. On review of multiple issues raised by the defendants, we reverse in part and remand for a new trial on damages.

## I. FACTS

In early 1978, United Service Corporation ("USC"), a wholly owned subsidiary of Capitol Savings & Loan ("Capitol"), headquartered in Cedar Rapids, Iowa, sold condominium units it owned in two Texas locations to Leisure Resource Group of Austin, Texas ("LRG") for purposes of operating a vacation time-share business. USC retained deeds of trust on the units and agreed to purchase the credit contracts generated from the sale of time-share intervals in the Texas condominia, thereby providing LRG with cash to meet operating expenses. As LRG's time-share business grew, so too did its credit line with USC.

The initial success of the time-share marketing project encouraged Kevin Alme, LRG's president, to acquire additional condominium units in various locations, without notifying USC or seeking credit from it. Although LRG began to pay off its indebtedness to USC, sometime in 1980, however, LRG began experiencing cashflow difficulties. In March 1981, LRG hired two consultants from Malibu, California, Allan Besbris and John Osburn, to organize its business affairs. Besbris and Osburn determined that a cash infusion was necessary for LRG to maintain its operations. Responding to USC's initial reluctance to provide further advances, the consultants threatened that LRG was on the verge of bankruptcy. USC perceived that bankruptcy would destroy the value of its collateral. Consequently, USC agreed to loan $700,000 to LRG, but it was stipulated that Alme would no longer sign checks on behalf of LRG, and Besbris would have to approve LRG's expenditures. While USC understood that this cash infusion would be used for LRG's business expenditures, it did not know that $210,000 (thirty percent) was secretly earmarked as a consulting fee for Besbris and Osburn.

USC and Capitol, as well as Besbris and Osburn, were also unaware that on July 23, 1981, Alme executed a contract (the "July contract") to purchase a hotel that could be converted into 55 condominium units in Cancun, Mexico, from the plaintiffs Inmobiliaria Kan Kun, S.A. ("IKK") and its principal Eugenio Riquelme Valdes. As payment for the property, LRG executed promissory notes with a combined face value of over $8,000,000.

*Alme's Demise*

Immediately after the cash infusion, LRG's business appeared to be progressing satisfactorily. Besbris and Osburn grew suspicious, however, when Alme became unable to meet current financial obligations, despite the budget they had formulated. Upon further investigation, Besbris and Osburn discovered that Alme had been misrepresenting the number of monthly sales of time-share units. Evidently, Alme had included in his sales figures "stiff contracts," or contracts executed but rescinded within the customer's rescission right period. Alme fraudulently pledged these contracts to USC as collateral for additional loans. Besbris promptly informed Dale Longwell vice president of both Capitol and USC and the officer in charge of the LRG account, of Alme's fraudulent actions and suggested that Alme be removed from office.

On October 9, 1981, Capitol and USC accelerated all of Alme's corporate and personal loans and took steps to foreclose on Alme's LRG stock, which secured them. Longwell, at that time had no experience in the time-share business, nor did anyone else in the lenders' employ. It seemed reasonable to offer Besbris and Osburn the opportunity to purchase the LRG stock and assume control of the company. Besbris and Osburn thereupon formed First Capital Partners, Inc., for the purpose of operating LRG and other related real estate ventures. Under an October 9, 1981 "Interim Operating Agreement," by and among Capitol, USC and First Capital Partners, Besbris and Osburn effec-

tively assumed control of LRG, and the LRG stock was placed in escrow for release to First Capital Partners when certain conditions were met. USC for its part agreed to loan more money to cover LRG's overhead expenses during the six-month term of the Interim Operating Agreement.

### Discovery of the Mexican Connection

After assuming control of LRG, Besbris received a call from Juan Mertz, a representative of IKK. Mertz claimed that LRG was behind in its payments on the promissory notes from the July contract. Besbris doubted the validity of this claim because LRG had been deluged with claims of creditors following Alme's ouster. When Besbris and Osburn verified the existence of the July contract, it was obvious that LRG's obligations under that contract would have a disastrous effect on LRG's ability to continue operations.

To avoid making immediate payments called for by the July contract, while retaining the attractive Cancun resort among LRG's time-share projects, Besbris and Osburn began negotiating a new contract with IKK. They told IKK that LRG could not fulfill the July contract terms, but that a new arrangement would be more advantageous to both parties. An agreement dated November 25, 1981 (the "November contract") accomplished the parties' goal, as it contemplated a joint effort between the parties to market the Cancun time-share units rather than an outright sale. Pursuant to the November contract, the July contract was terminated, the underlying promissory notes were destroyed, payments to IKK were delayed for over one year, and IKK and LRG agreed to divide the profits from the time-share operation. LRG projected that IKK could receive at least $6,000,000 under the new contract at intervals beginning December 31, 1982.

The curse associated with running LRG did not elude Besbris and Osburn. Losses continued to pile up, fueling the concern of Capitol and USC, as lenders, about LRG's financial condition. Their concern was ignited into action by information from an LRG employee that Besbris and Osburn were misusing corporate funds and that Besbris, unbeknownst to them, was a convicted felon. In June, 1982, the lenders instituted a receivership action to oust Besbris and Osburn from control of LRG. After succeeding in a preliminary injunction motion, the lenders settled with Besbris and Osburn and obtained control of LRG and its stock in consideration for a $150,000 cash payment. Subsequently, the LRG stock was transferred to another subsidiary of Capitol and Longwell became president of LRG.

Following the removal of Besbris and Osburn, relations between IKK and LRG soured. Each side believed that the other was failing to perform as specified in the November contract. In the fall of 1982, LRG terminated the November 1981 contract.

## II. PROCEDURAL BACKGROUND

IKK filed this action against Capitol, USC, and LRG seeking recovery for breach of the November 1981 contract, common law fraud, breach of warranty, breach of fiduciary duties, conversion, violation of the Texas Deceptive Trade Practices Act, civil conspiracy, and tortious interference with contractual relations. IKK's essential complaint is that it was fraudulently induced to give up valuable rights in the form of promissory notes owed by LRG under the July contract when it signed the November contract, which LRG did not perform.

IKK abandoned its conversion claim prior to trial. The day before trial, the district court granted defendants' motion for summary judgment on the breach of contract claim on the grounds that the November contract was illegal and unenforceable under Mexican law. Additionally, the court refused to allow IKK to amend its complaint to add a cause of action for breach of the July contract. At the close of evidence, the court directed a verdict against IKK on the tortious interference with contract, DTPA, and breach of fiduciary duty claims. Although uncertain as to whether a claim for tortious interference with business rela-

tions had been made, the court also granted a directed verdict for defendants on this claim.[1]

The case thus went to the jury on the sole theory that IKK was fraudulently induced to destroy the July promissory notes, with civil conspiracy and alter ego extending potential liability to Capitol and USC. The jury found for the plaintiff on these issues and awarded IKK actual damages of $6,600,000. The jury also assessed punitive damages of $100,000 against each of the three defendants. Prejudgment interest was also awarded.

## III. THE MERITS

Appellants Capitol, USC and LRG level several challenges to the district court's rulings, including the failure of the district court to grant a directed verdict and judgment notwithstanding the verdict on the issues of fraud, conspiracy, and alter ego. Additionally, appellants contend that, in the event the jury's finding of fraudulent inducement to contract is upheld, a new trial on the issue of damages is required because the judge erred in allowing the jury to consider evidence that was unsupported by the pleadings, pre-trial discovery, and the court's own rulings during trial.[2]

We first review appellants' contentions that the evidence fails to support the jury's findings under the *Boeing* standard.

If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc).

### A. *Fraudulent Inducement to Contract*

■ Appellants initially argue that fraud should not have been submitted to the jury. IKK posited two theories of fraud: that LRG fraudulently induced IKK to give up the "benefits" of the July contract by misrepresenting that LRG possessed the "skill, expertise, and knowledge" necessary to successfully perform the contract; and that LRG fraudulently misrepresented that it had adequate financial backing from Capitol to perform the November agreement. While both theories were submitted to the jury, a general verdict finding fraud was returned in Special Interrogatory Number 1.

To recover for fraudulent "misrepresentation" in the formation of a contract the plaintiff must show that: (1) a material misrepresentation was made; (2) the representation was, in fact, false; (3) the representation was known to be false when made or was made recklessly without knowledge as to its truth and as a positive assertion;[3] (4) the representation was

1. IKK failed to cross-appeal any of the issues decided adversely to it by the district court. Because of this omission, the issues considered on appeal are necessarily limited to those raised by Appellants.

2. Appellants devote much attention in their brief to the viability of a fraud action for inducement to enter into an illegal contract. They contend that the trial court's grant of summary judgment, concluding the November contract was illegal and unenforceable under Mexican law, prevents IKK from recovering damages on an "illegal" contract. This misconstrues IKK's essential theory: that it was fraudulently induced to part with the benefits of the allegedly legal and enforceable *July contract.* The validity of the July contract was not resolved in the trial court, probably because of the peculiar procedural posture of the case. See discussion in Part II above. We are not equipped to resolve the validity of the July contract in the first instance and decline to do so.

3. Although not cited by the parties, we are aware of conflicting authority on the issue of whether actual knowledge of the falsity is required to recover damages for fraudulent inducement to contract under Texas law. In *Fredonia Broadcasting Corp. v. RCA Corp.,* 569 F.2d 251 (5th Cir.1978), for example, a panel of this court concluded that Texas has dispensed with the knowledge requirement in fraud cases. The principal case relied upon in *Fredonia, Custom Leasing, Inc. v. Texas Bank & Trust Co.,* 516

made with the intention that it be acted on by the other party; (5) that the party did act in reliance on the representation; and (6) injuries resulted. *Stone v. Lawyers Title Insurance Corp.*, 554 S.W.2d 183, 185 (Tex.1977); *Custom Leasing, Inc. v. Texas Bank and Trust Co.*, 516 S.W.2d 138, 143 (Tex.1974); *Oilwell Division, U.S. Steel Corp. v. Fryer*, 493 S.W.2d 487, 491 (Tex. 1973).

With regard to IKK's second theory of fraud, there was sufficient evidence to support the jury's verdict that LRG misrepresented that it had the financial support necessary to perform successfully under the November agreement. The appellants claim, however, that the alleged representations by LRG that it had adequate financial backing from Capitol were mere expressions of opinion and not promises as to existing facts required to impose liability for fraudulent inducement to contract. We disagree. Besbris testified as IKK's witness at trial that he represented to IKK on numerous occasions that Capitol was LRG's financial "backer" and LRG's "partner" in the Cancun project. Besbris stated that this representation was false to the extent that Capitol never specifically agreed to provide LRG with cash-flow by purchasing the consumer contracts generated by the sale of time-share units in the Cancun project. The materiality of such financing was undisputed. Longwell testi-fied that LRG had several times requested and had several times been denied this critical type of funding, and that LRG representatives were aware of the lenders' continued refusal to provide such funding. Osburn confirmed that Capitol never agreed to finance the Cancun time-share paper. Besbris acknowledged his representations were made to induce IKK to sign the November contract. The jury could conclude, from the evidence presented, that injury resulted when IKK gave up the benefit of the July contract in exchange for a joint venture arrangement which required IKK to invest money in remodelling the 55 condominium units.

Because sufficient evidence supports the jury's finding that LRG fraudulently misrepresented its financial support, we need not address the sufficiency of evidence related to whether LRG fraudulently represented that it possessed the skill, expertise and knowledge necessary to perform the November contract.[4]

### B. *Lender Liability*

#### i. *Conspiracy*

■ In Texas, an actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W.2d 932 (Tex.1983); *Great National*

---

S.W.2d 138 (Tex.1974), did not hold that knowledge of the falsity is no longer required for fraud actions. To the contrary, *Custom Leasing* held a bank liable for money paid for the release of a mortgage which it knew was invalid.

In *J.L. Williams & Co. v. Robert E. McKee, Inc.*, 612 S.W.2d 649, 651 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.), however, the court rejected plaintiff's reliance on *Fredonia* and held that knowledge of the falsity, or recklessness in making a positive assertion is required to recover for fraud. Thus, this superseding Texas precedent requires us to disregard our decision in *Fredonia,* to the extent that it allowed recovery for fraudulent inducement to contract without a showing of knowledge or recklessness.

**4.** We need not reach the question and decline to rule on the validity of a cause of action for fraudulently misrepresenting that one possesses the "skill, expertise, and ability" to perform a contractual promise. The ability to perform a promise is implicit in every contract. Thus, allowing a plaintiff to proceed on this cause of action could result in construing every breach of contract as a fraud. Texas courts have been reluctant to sanction such a result. See, e.g., *Levine v. Loma Corp.*, 661 S.W.2d 779, 783 (Tex. App.—Fort Worth 1983, no writ) (and cases cited therein). In another context, *William B. Roberts, Inc. v. McDrilling Co.*, 579 S.W.2d 335 (Tex.Civ.App.—Corpus Christi 1979, no writ) held:

A promise to perform some act in the future, although made for the purpose of inducing another to enter into a contract, will not amount to legal fraud, though at a later date, the promise, without any excuse, is broken. This is a plain and well established proposition of law; *otherwise, every breach of contract would amount to fraud.*
Id. at 340 (emphasis added).

*Life Insurance Co. v. Chapa,* 377 S.W.2d 632 (Tex.1964). IKK claimed that appellants jointly conspired to fraudulently induce it to enter the November contract, thereby giving up the "benefits" of the July contract.

To show civil conspiracy a plaintiff must prove that: (1) there was a combination of two or more persons or entities; (2) there was an oral or written agreement among those persons or entities for a common purpose; (3) each of those persons or entities had knowledge of that purpose; (4) each of those persons or entities intended to participate therein; and (5) that one or more overt acts were done in furtherance of the conspiracy. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854 (Tex.1969). The evidence must "clearly establish the singular intent to defraud by each party, the common knowledge by all parties that each has such intent, and finally some concerted act to accomplish such fraud." *Guynn v. Corpus Christi Bank & Trust,* 589 S.W.2d 764, 771 (Tex.Civ.App.—Corpus Christi 1979, writ dism'd). Although circumstantial evidence may often be used to show intent, this element must be established by full, clear, satisfactory, and convincing testimony. *Switzer v. Joseph,* 442 S.W.2d 845, 850 (Tex.Civ.App.—Austin 1969, no writ).

In support of its conspiracy claim, IKK argues that Besbris's representation that Capitol would provide LRG with sufficient financial backing was made with the knowledge and consent of Capitol.[5] IKK fatally confuses the significance of this misrepresentation. Throughout the testimony in the district court, two types of "financing" were repeatedly identified and distinguished: (1) financing for certain interim overhead costs of running LRG; and (2) financing from a lender willing to discount consumer contracts or to loan money collateralized by notes from purchasers of time-share units. It is undisputed that the second type of financing was essential for the continued success of both LRG and the Cancun deal itself.

Any representation by LRG that Capitol had agreed to fund LRG's operating expenses in the interim period was true; therefore, LRG's false representations that Capitol would purchase the consumer contracts generated by the sale of Cancun time-shares must undergird the jury's conspiracy finding.[6] IKK was required to prove that Capitol or USC knew that LRG was misrepresenting Capitol's willingness to furnish the necessary consumer contract financing for the Cancun project.

There is no direct evidence of such knowledge by Capitol or USC. IKK offers only weak circumstantial evidence. Besbris, who claimed to be frequently discussing the status of the Cancun property with Longwell, recalled that in one conversation, Longwell instructed him to "just get us out of it [the July contract]." IKK contends that this controverted testimony indicates authorization to perpetrate the fraud against it. We disagree. Longwell's statement, while it indicates a desire to renegotiate an unfavorable deal, neither explicitly nor implicitly gave Besbris *carte blanche* to commit fraud on behalf of Capitol or USC. Texas law requires knowledge of the actual misrepresentation and not simply knowledge of the attempt to negotiate the new deal. *Guynn v. Corpus Christi*

---

5. IKK does not contend that the conspiracy finding rests on Capitol's and USC's acquiescence in the allegedly false representation concerning LRG's ability to perform the November contract. Nor do they contend that the lenders obtained knowledge of such representations. It appears that IKK's claim of conspiracy liability rests simply on intent to defraud IKK by false representations concerning the lenders' financial support. Indeed, the judge charged the jury only on conspiracy liability for falsely representing the lenders' financial backing.

6. Curiously, IKK's fact witnesses had no specific recollection of representations by Besbris or Osburn concerning the projected source of financing for the timeshare contracts, although all parties agree upon the significance of this item. Mertz testified that he "assumed" Capitol would provide it, while elsewhere he denied any knowledge of a funding source. At one point, IKK and LRG even discussed the possibility that LRG would obtain such financing. The November contract requires "best efforts" to obtain such funding, without mentioning any source.

*Bank & Trust,* 589 S.W.2d at 771; *see also Bourland v. State,* 528 S.W.2d 350 (Tex. Civ.App.—Austin 1975, writ ref'd n.r.e.) (holding that to show a conspiracy to engage in false, misleading or deceptive acts or practices in violation of the Texas DTPA conspirator must know that a course of conduct has a tendency or capacity to deceive). There is no other evidence in the record of this two-week trial that Longwell or any other representative of Capitol or USC, was involved in renegotiating the July contract. It requires a leap of faith, not a rational inference, to rest a finding of knowledgeable participation and hence a conspiracy, on this one statement.

IKK's additional circumstantial evidence fails to demonstrate knowledge or acquiescence by USC or Capitol in Besbris's false representation of financial backing. IKK observes that Longwell and Sheppard, another USC employee, visited Cancun in early December, 1981, after the November contract had been essentially negotiated. Although Longwell and Sheppard stayed overnight and met with both Mertz and Valdez of IKK, there is an utter absence of evidence that either lender confirmed Besbris's false representation of financial backing for the timeshare contracts. Shortly after this trip, Besbris and Osburn travelled to Iowa to present the November contract and the renegotiated Cancun deal to USC. Based on the identical revenue projections that LRG had furnished to IKK and the mutual conclusion of the parties that Cancun might be a jewel in the crown of the LRG business, Capitol and USC lent $100,000 to LRG to commence performance under the November contract. Besbris and Osburn falsely led their lenders to believe that the $100,000 paid for the project's personal property, while it was actually a penalty insisted upon by Valdes for cancelling the July contract. The sparse evidence admitted at trial concerning this December presentation is here summarized. Even the testimony by Besbris concerning the December presentation fails to suggest that Capitol or USC knew of or acquiesced in any representation that they would continue to finance the Cancun transaction by lending on the timeshare contracts. Without such evidence of knowing participation in the fraud, IKK's conspiracy allegation fails. This portion of the verdict may not be sustained.

## ii. *Alter ego*

■ Joint liability of Capitol and USC for LRG's fraud was also awarded pursuant to jury findings that each lender was the "alter ego" of LRG. Whether the evidence before the jury was sufficient to warrant this result requires preliminary analysis of the law concerning disregard of a corporate entity.

Justice Cardozo aptly characterized the analytic framework for piercing the corporate veil as being shrouded in the "mist of metaphors." *Berkey v. Third Avenue Railway Co.,* 244 N.Y. 84, 155 N.E. 58 (1926) (Cardozo, J.). Texas law does not contradict this description. In *Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex. 1986), the state supreme court recently enumerated the various bases for piercing the corporate veil:

(1) when the corporate fiction is used as a means of perpetrating a fraud;

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation;

(4) where the corporate fiction is employed to achieve or perpetrate monoply;

(5) where the corporate fiction is used to circumvent a statute; and

(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong. (citations omitted).

In this case, we confront only the issue of alter ego status [7], the fastening of liability

---

**7.** Appellee predicates its brief on the argument that the jury findings support liability of the lenders for dealing with LRG and IKK as part

of a "sham to perpetrate a fraud." *Castleberry,* however, squarely differentiates this branch of the doctrine of disregarding the corporate entity

when "a corporation is organized and operated as a mere tool or business conduit of another." *Pacific American Gasoline Co. v. Miller,* 76 S.W.2d 833, 851 (Tex.Civ.App. —Amarillo 1934, writ ref'd).

In *Castleberry,* the test of alter ego liability was described as follows:

> Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice. It is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. Alter ego's rationale is: "if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors." Ballantine, Corporations § 123 at 294 (1946). (citations omitted).

721 S.W.2d at 272.

Elaborating upon the specific indicia of corporate identity is the requirement that "the corporate arrangement must be one which is likely to be employed in achieving an inequitable result by bringing into operation a basically unfair device which in all probability will result in prejudice to those dealing with one or more of the units making up the corporate arrangement...." *Bell Oil & Gas Co. v. Allied Chemical Corp.,* 431 S.W.2d 336, 340 (Tex.1968).[8] In alter ego cases, the unfairness consists, not in fraud, but in the fact that the dominant shareholder or parent entity, because it controls the subservient company, is the party responsible for creating the subservient's debts. Armed with the law, we proceed to the battle-ground of the facts.

A threshold concern is the existence of any corporate unit to which the alter ego doctrine may be applied. Prior to the specific events spanned by this case, LRG was a corporation "related" to its lenders only by a lien on all of its stock owned by Alme. IKK flamboyantly characterizes the lien as a "strangle hold," but no evidence ties the lien to any improper or overreaching activity by the lenders. The rights under the lien on the stock were exercised when Alme was removed from LRG. Simultaneously, Capitol and USC executed the Interim Operating Agreement and placed into escrow the LRG stock, covenants of marketable title, and stock powers executed by Mr. and Mrs. Alme and by First Capital Partners. Under the Interim Operating Agreement, First Capital Partners was to "take possession of the business of LRG [immediately] and operate it in a prudent manner." The agreement further provides that

> Subsequent to the execution of this agreement, a definitive acquisition agreement with respect to the stock and the assets of LRG, subject to the debt and

from the alter ego or conduit theory. Prior Texas law, although not fully consistent, likewise distinguished theories of liability involving alter ego status and the sham to perpetrate a fraud. See, e.g., *Vallone v. Vallone,* 618 S.W.2d 820, 824 (Tex.Civ.App.—Houston [1st Dist.] 1981), rev'd on other grounds, 644 S.W.2d 455 (Tex.1982); *Wolf v. Little John Corp.,* 585 S.W.2d 774, 778 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.); *Roylex, Inc. v. Langson Bros. Construction,* 585 S.W.2d 768, 771 (Tex. Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). Appellee went to trial on a second amended petition which portrays only alter ego liability, and the jury charge (to which IKK's objection for broader language was overruled) referred to the alter ego theory along with indicia concerning whether the corporate form had been ignored. Appellee may not change legal horses midway through this stream.

**8.** Professor Hamilton observes that many Texas cases decided by reference to alter ego, instrumentality, or "conduit" characterizations may also be predicated on traditional principles of agency or estoppel. 19 R. Hamilton, Texas Practice: Business Organizations § 234 (1973). See also 38 A.L.R.3d, 1110–21 (1971). The benefit of such an approach would be to remove some types of cases from the equity-intensive, analytically unsatisfactory veil-piercing rubric. The Texas Supreme Court acknowledged this possibility in *Gentry v. Credit Plan Corp.,* 528 S.W.2d 571, 575 (Tex.1975), but rejected it.

liens, will be entered into between the parties. All parties hereto intend to bargain in good faith towards that objective. In the event the parties were unable to reach a "definitive agreement" on or before April 30, 1982, the Interim Operating Agreement mandated binding arbitration. If the lenders were determined to be at fault, the LRG stock, subject to the debt and liens, was to be delivered to First Capital Partners. The intent of the Interim Operating Agreement was thus to transfer the stock of LRG to Besbris and Osburn, albeit subject to negotiating a definitive agreement in a stated period of time. During the Interim Operating Agreement phase, Capitol did not possess or control the LRG stock, which was committed to the escrow agent. Even if Capitol technically owned the stock, the terms of the escrow agreement prevented it from exercising the prerogatives of stock ownership. Capitol's lack of control over the stock is highlighted by its having to resort to a state court receivership action in the summer of 1982 to remove Besbris and Osburn from their positions with LRG. We find the Interim Operating Agreement inconsistent with a facile conclusion that Capitol and USC "owned" LRG at the critical times.

Unequivocal, 100% ownership may be a symptom but not the *sine qua non* of alter ego status. We have found no Texas cases dealing with a situation exactly like this one. On the other hand, in *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336, the Texas Supreme Court did conduct an alter ego analysis where the companies allegedly so related were corporate affiliates, one of which was only half owned by their joint officers. The court refused to conclude that they were alter egos. Subsequently, this court, after carefully reviewing the sparse precedent, concluded in a case founded on Alabama law that "actual and total control" of the subservient entity by the dominant corporation was required in the absence of actual stock ownership. *Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.*, 483 F.2d 1098, 1104 (5th Cir.1973, modified factually 490 F.2d 916 (1974)). Melding these prece-

dents, we predict that Texas courts would not invariably require full and unfettered ownership of the corporation whose veil is sought to be pierced on alter ego grounds, but in the absence of such a condition, particularly persuasive evidence of control would be required. Alter ego status is tautological with actual control of the subservient entity. Unrestricted ownership of that entity provides a logical backdrop for domination, although ownership alone will not support an alter ego finding. *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 573 (Tex.1975). In the absence of full ownership, or where there is no ownership of the allegedly controlled entity, other significant indications that the autonomy of a corporation has been supplanted by the actions of the allegedly dominant company must exist before alter ego liability will be imposed.

The Interim Operating Agreement, as shown, does not demonstrate unrestricted ownership of LRG by its lenders. Moreover, appellants properly note that there is no evidence that LRG ever failed to observe corporate formalities; that no shareholder or director meetings were held; that complete and separate corporate and financial records were not maintained between LRG and its lenders; that property of LRG and the lenders was indiscriminately comingled; that there were identical officers and directors, business activities or offices between the lenders and LRG; or that creditors were confused as to whether they were dealing with LRG or its lenders. The objective indicia of control and alter ego status are absent. In *Lucas v. Texas Industries*, 696 S.W.2d 372 (Tex.1984), the Texas Supreme Court refused to find that a parent company was the alter ego of its subsidiary where these enumerated common characteristics did not exist.

Undaunted, IKK reverts to two arguments to justify the lenders' alter ego status. First, IKK contends that the practical effect of the Interim Operating Agreement, which committed the lenders to advance day-to-day operating costs to LRG, "propped it up" as a mere shell and conduit for the lenders' schemes. To describe the

situation in this way is a mischaracterization. LRG was doing business and generating receivables throughout the events covered by the case. It had 20 to 30 full-time office employees, several sales locations and serviced time-share contracts for thousands of customers at several resort properties. Alme, Besbris and Osburn superintended this business quite apart from the Cancun negotiations. LRG was losing money, however, and the threat to its existence jeopardized the lenders' collateral position. If LRG failed, not only would the lenders' liens on real property be foreclosed, but the time-share contracts for these properties would become worthless as collateral. The goal of the Interim Operating Agreement was to keep LRG in business and preserve the value of its assets. This goal is fundamentally at odds with IKK's implication that the lenders were trying to drain LRG of assets to the detriment of LRG's other creditors.

Pursuant to the Interim Operating Agreement, the lenders committed to lend a maximum of $60,000 per month (through April, 1982) to pay, in their unilateral discretion, the general and administrative costs of operating LRG. The record does not clearly show the mechanics for exercise of "unilateral discretion." The lockbox account maintained for receivables was acknowledged to be a common security device. Even if the lenders approved each and every one of LRG's business expenditures, this does not *ipso facto* prove their control over LRG. As this court explained in *Krivo*, 483 F.2d at 1111, the ability of a lender to monitor a debtor's expenditures pursuant to a loan agreement represents a veto power which is negative in nature and when exercised in such a limited sense does not amount to domination or control.

Lack of control more properly describes the lenders' performance under the Interim Operating Agreement, because they often funded far more than $60,000 monthly to LRG, and in one month they funded over $300,000. During the period of the Interim Operating Agreement, LRG opened up a costly new sales office in Oklahoma City, a focal point of whose promotions was the Cancun Property. LRG hired a New York firm to prepare an advertising campaign for LRG, emphasizing the Cancun project. There is no evidence that trade creditors of LRG were deferred or that some were unfairly preferred during this period. Besbris and Osburn somehow purchased personal items such as gold jewelry on the corporate account without scrutiny by the lenders. Reality thus intrudes on IKK's pat syllogism. One may question the wisdom of the lenders' loans pursuant to the Interim Operating Agreement, but there is no evidence that in their administration, the loans were intended to or did usurp daily management decisions regarding LRG. The lenders' actions, so far as the record reveals, were confined to legitimate, limited controls for the purposes of protecting a multimillion-dollar loan package and attempting to keep LRG in business.

These facts contrast starkly with *Gentry*, in which the record showed not only an avoidance of most corporate formalities but that the subsidiary's business was being conducted from the same office and with the same people as that of the parent corporation. This case also differs critically from Sagebrush Sales Co. v. Strauss, 605 S.W.2d 857 (Tex.1980), in which the Texas Supreme Court held the principal individually liable for the debt of its Corporation, when the individual acted in such a manner to lead the creditor corporation to believe that it was actually doing business with the individual himself. There the jury found that the business affairs of the individual were indistinguishable from the business affairs of the corporation, that the creditor corporation relied on the personal financial statements of the individual, and that the defendant intended to cause its creditor to believe that credit was being extended to him individually.

IKK's second argument seems to be that because the lenders assisted in perpetrating a fraud against it, a misuse of LRG's corporate form resulted which justifies treating LRG as the lender's alter ego. Even if we assume the existence of a con-

spiracy, the implication of IKK's argument is that any malfeasance by a corporation is a misuse of its form. This extreme position would result in denying recognition of the corporate entity in every case and would nullify the unquestioned social benefits of limited liability. See Posner, "The Rights of Creditors of Affiliated Corporations," 43 U.Chi.L.Rev. 499 (1976). Moreover, alter ego liability results from a finding that all of the activities of the subservient corporation have been conducted by the dominant company or shareholder. Premising liability on one tort committed by a related shareholder or corporation, without other evidence of control, inherently conflicts with alter ego theory. Finally, IKK's argument, applied to this case, equates liability for conspiracy with alter ego liability, which poses another contradiction in terms. Ordinarily, if two entities are so intertwined as to be alter egos, they would not have sufficient separate existence to be liable for conspiracy. *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Co.,* 435 S.W.2d 854, 856 (Tex.1969) (holding that civil conspiracy consists of a combination of two or more persons or entities); *see also, Nelson Radio & Supply Co. v. Motorola,* 202 F.2d 911, 914 (5th Cir.1952) (holding that a corporation cannot conspire with itself). This last-ditch plea by IKK to preserve its judgment simply does not wash under the doctrine of alter ego.

We conclude that a reasonable jury could not have found that Capitol or USC were alter egos of LRG.

## IV. DAMAGES

■ Appellants vigorously contend that the trial court abused its discretion in allowing the jury to consider evidence in calculating damages that was unsupported by the pleadings, pre-trial discovery, and the court's own rulings during trial. Appellants deny that they were properly notified that IKK would use the July contract as a basis for damages under any theory of recovery and, therefore, allowing the jury to consider such evidence was prejudicial error. For the reasons explored below, we conclude that prejudicial error in the proceedings requires a new trial on the issue of damages. Fed.R.Civ.P. 59(a); *Shelack v. White Motor Co.,* 581 F.2d 1155, 1160 (5th Cir.1978); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2814 at 93 (1973).

In resolving this issue we are controlled by the policy expressed in *Shelack v. White Motor Co., supra,* and the spirit of the Federal Rules of Civil Procedure to promote full and adequate pretrial discovery. *Shelack* held that reversible error results from unfair surprise where a plaintiff seeks to add a completely new basis for damages on the eve of trial. There, plaintiff's complaint stated a cause of action for personal injuries resulting from a truck accident. Plaintiff's response to interrogatories indicated that the sole basis for its recovery was back injuries sustained as a result of the accident. However, three days before trial plaintiff sought to add a claim for damages resulting from a subsequent heart attack. The district court denied defendant's motion for a continuance and the parties proceeded to trial. This court reversed the district court for error in denying a continuance and remanded the case for a new trial on the issue of damages.

The court concluded that the plaintiff withheld its additional basis for recovery in contravention of the federal rules of discovery. *Shelack,* 581 F.2d at 1159. This resulted in a "trial by ambush" whose day had ended. Although the court noted that the defendant was aware that the plaintiff had suffered a heart attack, "there was no forewarning that the heart attack would serve as the foundation for one of the key issues at trial." Id. The court found further significance in plaintiff's response to the interrogatory that was designed to determine whether the plaintiff was proceeding under a claim that the heart attack was proximately caused by the accident. The answer given in discovery was that no such contention was made. *"At the eleventh hour, it was revealed that the heart at-*

*tack was, indeed, a principal claim."* Id. at 1160 (emphasis added).

The development of this case bears a striking resemblance to *Shelack.* IKK's Second Amended Complaint contains a count for common law fraud and a prayer for damages totalling $8,000,000. IKK's response to appellants' Second Set of Interrogatories indicates that the basis of damages flowed from the failure or inability of LRG to perform under the November contract—i.e., lost profits. Any mention of the July contract or the underlying promissory notes is conspicuously absent. Additionally, IKK's proposed pre-trial order never mentions the July contract as a basis for damages under any theory of recovery.

Appellants first became aware that plaintiff would attempt to use the July contract and the underlying promissory notes as a basis for recovery just before trial. Following summary judgment in favor of appellants on the claim for breach of the November contract, IKK sought to amend its complaint to add a claim for breach of the July contract. The district court denied this motion.[9] During the presentation of IKK's case, appellants conscientiously and repeatedly objected to any testimony concerning the July contract or the promissory notes. These objections were overruled and the judge allowed the evidence to be introduced for the limited purpose of showing either tortious interference with the November contract or tortious interference with a business relationship. See Fed.R. Evid. 105. At the close of IKK's case, the court granted directed verdicts on both of these claims.

Before the close of appellants' case, IKK again attempted to elicit testimony on the July contract. Appellants timely objected to this questioning, asserting that the court's directed verdict rulings gave the objection new force. Inexplicably, the court overruled this objection and allowed

counsel to continue questioning concerning the July contract despite its previous rulings that eliminated the basis upon which such evidence was originally admitted. Finally, appellants timely objected to any reference to the July notes in both the jury charge and in counsel's closing argument.

Although this case is not directly controlled by *Shelack,* we conclude that the defendant was severely prejudiced when the judge allowed the jury to consider evidence on a theory of damages never properly incorporated into plaintiff's case. The Federal Rules of Civil Procedure were clearly designed to avoid this result. *Woods ex rel. Woods v. International Harvester Co.,* 697 F.2d 635, 639 (5th Cir. 1983). For example, Rule 16(e) instructs judges to enter pre-trial orders to define the scope of issues at trial. We have said that the district court should construe such orders narrowly because a "failure to adhere to such a rule would bring back the days of trial by ambush and discourage timely preparation by the parties for trial." *Swift v. State Farm Mutual Auto Insurance Co.,* 796 F.2d 120 (5th Cir.1986). Although no pretrial order was technically entered in this case, a comparable roadmap of the contested issues existed in the pleadings, interrogatory answers, and IKK's proposed pretrial order. IKK will not be allowed to prevail on a theory of damages created on the eve of trial and never fairly introduced as such during trial.

"To permit plaintiffs to switch causes of action after the trial had ended would mean that defendant would be facing the possibility of being held liable under a claim it had no opportunity to evaluate and defend against." *Flannery v. Carroll,* 676 F.2d 126, 131 (5th Cir.1982). When the judge allowed IKK to introduce evidence on the July contract and the promissory notes, it was for the purpose of showing interference with contractual relations; it was not

---

**9.** It is also significant that the trial court denied IKK's motion to amend its complaint to conform to the evidence. Fed.R.Civ.P. 15(b). Following trial, IKK essentially renewed its request to add a claim for breach of the July contract. The court presumably denied this motion for the same reason it denied IKK's pre-trial motion to amend—namely, allowing IKK to proceed on the breach of the July contract would surprise the defendants and prejudice its defense on the merits.

for the purpose of proving damages for fraudulent inducement to contract. Because appellants were never properly notified that this would be IKK's basis for calculating damages and the entire focus of its closing argument on that issue, the judge should have instructed the jury to disregard evidence of the July notes on the issue of damages. The failure to so instruct the jury, upon timely request by appellants, severely prejudiced appellants.[10] The issue of damages must be reversed and remanded for a new trial.

## V. CONCLUSION

Appellants also challenge the award of pre-judgment interest and the joint and several liability of all defendants for punitive damages. Because we remand this case for a new trial on damages, and because we find that liability may only be imposed upon LRG, these final contentions need not be addressed. No punitive damages may be awarded in the absence of liability for actual damages, nor should the punitive damage assessment against LRG remain intact after vacation of the actual damage award.

This case is AFFIRMED in part, REVERSED in part, and REMANDED to the district court with instructions to conduct a new trial on the issue of damages.

---

**10.** Had appellants known that the lost promissory note payments would have been the basis for damages, they could have developed defenses concerning the unenforceability under Mexican law of the July contract, the uncollectability of the July notes, the market value of the Cancun project at relevant times, and the non-existence of a $3.9 million "credit" from IKK to LRG whose repayment was built into the notes. These are both plausible and weighty potential defenses.