Rhonda 



 NO. 12-01-00347-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


ENRON OIL & GAS COMPANY, EOG
§
 APPEAL FROM THE 

RESOURCES, INC., ENRON OIL & GAS

CARTHAGE, INC., ENRON OIL & GAS

ACQUISITIONS, L.P. AND EOG

RESOURCES ACQUISITIONS, L.P.

APPELLANTS


V.
§
 COUNTY COURT AT LAW



OLIN V. JOFFRION, JR., TRUSTEE

OF THE OLIN V. JOFFRION FAMILY

TRUST NO. ONE,

APPELLEE
§
 PANOLA COUNTY, TEXAS

 

OPINION


 EOG Resources, Inc. and EOG Resources Acquisitions, L.P. f/k/a Enron Oil & Gas
Company, Inc. ("EOG") bring this interlocutory appeal from a class certification order in which the
trial court certified a class premised upon breaches of express and implied covenants in oil and gas
leases held by the approximately 300 members of the purported class. We reverse and remand for
decertification. 


Background

 EOG is a current or previous lessee, and a current and former operator. As a current operator,
EOG is responsible for remitting royalty payments under forty-five oil, gas and mineral leases in the
Carthage Fieldwide Gas Unit located in Panola County, Texas. EOG produces and sells gas from
lands covered by the leases in the Carthage Gas Unit. Class representative Olin V. Joffrion, Jr.,
Trustee for the Olin V. Joffrion Family Trust No. One ("Joffrion"), claims a royalty interest under
an oil, gas and mineral lease covering land located in the Carthage Gas Unit.

 Joffrion filed suit against EOG alleging that it failed to pay proper royalties, failed to market
the gas in a reasonable manner, and failed to satisfy certain notification requirements of the Royalty
Reporting Standards. Joffrion subsequently moved to certify a class of all royalty owners in the
Carthage Gas Unit. Joffrion identified three issues on which certification was sought: 1) whether
EOG charged expenses not authorized by the leases; 2) whether EOG assessed higher operating
expenses than a reasonably prudent operator would have charged, and in doing so breached an
implied duty to reasonably manage the leases; and 3) whether EOG failed to pay fair market value
for gas and natural gas liquids. In support of his motion for class certification, Joffrion claimed that
all royalty owners in the Carthage Gas Unit have leases containing an express provision relating to
the charging of costs, that the leases contain "virtually the same terms and provisions regarding
royalty payments," and that each of these leases is "typical of the other." 

 There are forty-five leases in the Carthage Gas Unit under which royalties have been paid
during the relevant time period. According to EOG, these leases utilize at least eight standard lease
forms. There are also additional leases which are typed, using no standard form. The gas royalty
provisions of the leases in question range from requiring royalties to be paid based on the net
proceeds received, to leases requiring royalties to be paid based on market value at the well, to leases
requiring royalties to be paid based on a fixed price. Also, the leases address the lessee's use of gas
in different ways and have different provisions governing other aspects of the payment of royalties.

 The trial court rejected certification of the market value issue, but granted certification based
upon two of Joffrion's complaints. The certification order states that the first issue to consider is
whether EOG "charged production expenses consisting of compression charges to royalty owners
and, if so, what amount was charged to royalty owners during the period in question." The order
states that this issue is predicated upon breach of the express covenant found in the leases that royalty
is to be free of production expenses. The second issue to be determined is whether EOG charged
"royalty owners with post-production expenses greater than those which a reasonably prudent
operator would have charged and, if so, what is the amount overcharged in each of the specific
categories challenged." This issue is predicated upon breach of the implied covenant to reasonably
manage the leases. 

 EOG appeals on the following issues: 1) Did the trial court abuse its discretion by certifying
a class without properly applying the substantive law to Joffrion's claims as required by Rule 42; 2)
Did the trial court abuse its discretion in certifying a class where the predominance requirements of
Rule 42 cannot be satisfied; 3) Did the trial court abuse its discretion by entering a class certification
order which does not satisfy the requirements of Bernal; and 4) Did the trial court abuse its
discretion by appointing Joffrion as class representative. 


Standard of Review for Class Certification

 An appellate court should reverse a trial court's certification order only if the record shows
that the trial court committed a clear abuse of discretion. E&V Slack, Inc. v. Shell Oil Co., 969
S.W.2d 565, 567 (Tex. App.-Austin 1998, no pet.). An abuse of discretion occurs if the trial court
acts without reference to any guiding principles or acts arbitrarily or unreasonably. Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 242 (Tex. 1985). A failure to analyze or apply the
law correctly is an abuse of discretion. Huie v. DeShazo, 922 S.W.2d 920, 927-28 (Tex. 1996). An
appellate court, in reviewing a trial court's decision, should not err in favor of certification. See
Southwestern Ref. Co. v. Bernal, 22 S.W.3d 425, 434-35 (Tex. 2000). Although the ultimate issue
at the trial court level is whether the defendant breached both express and implied covenants, the
question before us is whether the propriety of its conduct can and should be decided on a class-wide
basis. This court "may not consider the substantive merits of the case, and class proponents are not
required to prove a prima facie case in order to be certified as a class." Reserve Life Ins. Co. v.
Kirkland, 917 S.W.2d 836, 842 (Tex. App.- Houston [14th Dist.] 1996, no writ), overruled, Bernal,
22 S.W.3d at 434. However, to make a proper analysis, "going beyond the pleadings is necessary,
as a court must understand the claims, defenses, relevant facts, and applicable substantive law in
order to make a meaningful determination of the certification issues." Castano v. American
Tobacco Co., 84 F.3d 734, 742 (5th Cir. 1996).




Rule 42 

Rule 42(a) Requirements

 Under Rule 42(a) of the Texas Rules of Civil Procedure, all class actions must satisfy four
requirements: 1) numerosity ("the class is so numerous that joinder of all members is
impracticable"); 2) commonality ("there are questions of law or fact common to the class"); 3)
typicality ("the claims or defenses of the representative parties are typical of the claims or defenses
of the class"); and 4) adequacy of representation ("the representative parties will fairly and
adequately protect the interests of the class"). Tex. R. Civ. P. 42(a). The only 42(a) requirement
disputed in this case is adequacy of representation.

Adequacy of Representation

 Adequacy of representation requires that the class representatives' interests cannot be
"antagonistic" to the interests of the rest of the class. Tex. R. Civ. P. 42(a). Secondly, the class
representatives, through their counsel, must show the court that they will vigorously prosecute the
action. Id. The Texarkana Court of Appeals has listed certain relevant factors to consider in
determining if the adequacy of representation element is satisfied: 1) adequacy of counsel; 2)
potential for conflicts of interest; 3) personal integrity of the plaintiffs; 4) whether the class is
unmanageable because of geographic limitations; 5) whether the representative plaintiffs can afford
to finance the class action; and 6) the representative plaintiffs' familiarity with the litigation and his
or her belief in the legitimacy of the action. Glassell v. Ellis, 956 S.W.2d 676, 682 (Tex. App.-
Texarkana 1997, no pet.). 

 EOG takes the position that Joffrion cannot adequately represent the class because of his
inability to finance the class action, and his unfamiliarity with the litigation. At the certification
hearing, Joffrion testified that he had worked in the family oil and gas business for ten years. He
asserted that he had served previously as a class representative in two other royalty disputes, and that
he assisted counsel in both cases in which the royalty owners prevailed. He admitted that the trust
had only received approximately $2,600.00 in royalties from the Carthage Unit in the previous five
years. Joffrion explained what he understood the lawsuit to be about, and claimed that he initiated
the litigation based upon his own personal belief that EOG was charging too much for expenses. His
attorneys then testified that they were financing the class action, and that they would have no trouble
doing so. Based upon this testimony, we hold that the trial court did not abuse its discretion when
it appointed Joffrion class representative. Accordingly, we overrule issue four. 

Rule 42(b) Requirements

 If the 42(a) elements are satisfied, the trial court must then determine if the class action is
maintainable. Tex. R. Civ. P. 42(b). There are four subsections of 42(b), at least one of which must
be satisfied before class certification is appropriate:



 the prosecution of separate actions by or against individual members of the class would
create a risk of


 

 (A) inconsistent or varying adjudications with respect to individual members of the
class which would establish incompatible standards of conduct for the party
opposing the class, or


 (B) adjudications with respect to individual members of the class which would as
a practical matter be dispositive of the interests of the other members not parties to
the adjudications or substantially impair or impede their ability to protect their
interests; or



 the party opposing the class has acted or refused to act on grounds generally applicable to
the class, thereby making appropriate final injunctive relief or corresponding declaratory
relief with respect to the class as a whole; or

 where the object of the action is the adjudication of claims which do or may affect specific
property involved in the action; or

 the court finds that the questions of law or fact common to the members of the class
predominate over any questions affecting only individual members, and that a class action
is superior to other available methods for the fair and efficient adjudication of the
controversy.



Tex. R. Civ. P. 42(b)(emphasis added). Joffrion seeks certification under (4).

Predominance

 Under Rule 42(b), "common" questions must predominate over questions affecting only
individual class members. Tex. R. Civ. P. 42(b)(4). A common question exists when the answer
as to one class member is the same as to all. Spera v. Fleming, Hovenkamp & Grayson, P.C., 4
S.W.3d 805, 810 (Tex. App.-Houston 1999, no pet.). Common questions that do not produce
common answers do not satisfy the Rule 42 commonality requirement. Wente v. Georgia-Pacific
Corp., 712 S.W.2d 253, 257 (Tex. App.-Austin 1986, no writ). The "predominance requirement

. . . is one of the most stringent prerequisites to class certification." Bernal, 22 S.W.3d at 433. 
Courts determine if common issues predominate by identifying the substantive issues that will
control the outcome of the litigation, assessing which issues will predominate, and determining if
the predominating issues are, in fact, common to the class. Id. at 434. The test for predominance
is not whether common issues outnumber uncommon issues, but whether common or individual
issues will be the subject of most of the litigants' and court's efforts. If, after common issues are
resolved, presenting and resolving individual issues is likely to be an overwhelming or
unmanageable task for a single jury, then common issues do not predominate. Id. Ideally, a
judgment in favor of the named plaintiffs should decisively settle the entire controversy, and all that
should remain is for other class members to file proofs of claim. Id. 

Breach of Express Covenant

 The first question certified by the trial court is whether EOG charged production expenses
to royalty owners in breach of an express covenant. Royalty is commonly defined as the landowner's
share of production, free of expenses of production. Heritage Resources v. Nationsbank, 939
S.W.2d 118, 121-22 (Tex. 1996). Although it is not subject to the costs of production, royalty is
usually subject to post-production costs, including taxes, treatment costs to render it marketable, and
transportation costs. Id. at 122. But express covenants must be ascertained from the provisions of
each individual oil and gas lease. Texas Oil & Gas Corp. v. Vela, 429 S.W.2d 866, 870 (Tex. 1968). 
Even though there are general rules as to production and post-production expenses, the parties may
modify these general rules by agreement. Martin v. Glass, 571 F. Supp. 1406, 1410 (N.D. Tex.
1983), aff'd, 736 F.2d 1524 (5th Cir. 1984)(citing 3 Howard R. Williams & Charles J. Meyers,
Oil and Gas Law § 645 p. 591, et seq. (1990)).

Analysis 

 Randall Lee Stanger, the revenue accounting supervisor for EOG's Oklahoma City/Tyler
division, testified that every royalty owner received the identical price per unit for all gas produced
from the Carthage unit. The payment of all royalties was computed on an index price rather than the
actual price for which it sold or on a market value price. Stanger also stated that a compression
expense was deducted from every royalty paid. This was true without regard for the express terms
of the lease. 

 Joffrion contends that certifying a class action is appropriate in this case because


 [royalty owners] have been treated identical for how many years now, I don't know, at least since 1996. 
All accounting methods are identical. All pricing is identical. All expense deductions are identical. 
All volumetric deductions are identical. Every royalty owner has been treated in a common and typical
way by [EOG]. And what they don't want us to do now is go forward in a common and typical manner. 
They're saying, "Even though we treat you the same, to come back against us, you got to divide into
45 little groups," which they know can't be done, Your Honor.



Joffrion maintains that the court could and should treat all the leases the same, even though the parties
admit that the leases are not the same. We do not agree. It should go without saying that a breach
is determined by comparing the terms of a contract with the actions of the alleged breaching party. 
See Bendalin v. Delgado, 406 S.W.2d 897, 899 (Tex. 1966)(a court cannot determine if a contract
has been breached unless it can ascertain the legal obligations of the parties). In the case before us,
a jury would have to look at forty-five individual leases and determine that each lease contained an
express covenant not to deduct compression charges as a production expense from royalties. Only
then could the jury decide if, in fact, EOG breached that express covenant.

 For example, Sam Cobb, EOG's expert witness, testified that he had divided the forty-five
leases into twelve groups. In one group, the leases provide for a gas royalty based on "the net
proceeds derived from the sale of gas from each well where gas only is found while the same is being
sold or used off the lease premises." Cobb noted that there is no provision detailing how to pay
royalties if the sale occurs at the well as opposed to off the premises. In a second set of leases, the
royalty is based upon the value of the gas. However, the lease fails to state whether it is the value of
the gas at the mouth of the well or whether it is at the point of sale. These different royalty clauses,
as well as the matters which are open to interpretation in these royalty clauses, are significant because
the deduction of expenses, whether it be production or post-production, is integral to the royalty
calculation. 

 It is clear that there can be no presumption that an express term exists in each lease; that
question must be resolved on a case-by-case basis. Consequently, individual, not common, issues
would be the focus of the parties' efforts in a trial on the merits. We hold, therefore, that the trial
court erred when it ruled that the issue of the express covenant not to charge royalty owners with
production expenses is a predominant issue in this case. 

Breach of Implied Covenant

 The second question certified by the trial court is whether EOG charged post-production
expenses to royalty owners in breach of an implied covenant to charge expenses no greater than those
which a reasonably prudent operator would have charged. The only way to determine whether a
particular lease contains an implied covenant is to examine the express terms of the lease. See
Yzaguirre v. KCS Resources, Inc., 53 S.W.3d 368, 373 (Tex. 2001). For example, a covenant will
not be implied unless it appears from the express terms of the contract that it was so clearly within
the contemplation of the parties that they deemed it unnecessary to express it and therefore they
omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate
the full purpose of the contract as a whole as gathered from the written instrument. Union Pacific
Resources Group, Inc. v. Neinast, 67 S.W.3d 275, 281 (Tex. App.-Houston [1st Dist.] 2001, no
pet.). Covenants are implied, therefore, only when deemed fundamental to the purpose of a mineral
lease and the lease does not expressly address the subject matter the covenant sought to be implied. 
An implied covenant is not to be assumed; the court must examine the leases under consideration to
determine whether the parties expressly agreed or stipulated to the subject matter of the covenant
sought to be implied. Id. at 282. 

 Further, once it is determined that a lessee is bound by implied obligations relating to
operation on the leasehold, the question arises regarding the standard of conduct to which the operator
is held. In Texas, the "reasonably prudent operator" standard is the general rule governing
performance of implied lease covenants. United States Steel Corp. v. Whitley, 636 S.W.2d 465, 471
(Tex. App.-Corpus Christi 1982, writ ref'd n.r.e.). It is possible, however, for a lessee to lessen the
burden of the prudent operator standard by express provision specifying a lower standard. See Coats
v. Brown, 301 S.W.2d 932, 935-36 (Tex. Civ. App.-Texarkana 1957, no writ); Magnolia Petroleum
Co. v. Page, 141 S.W.2d 691, 693 (Tex. Civ. App.-San Antonio 1940, writ ref'd). 

Analysis

 Joffrion maintains that there is a covenant implied in each of the forty-five leases that EOG
will not charge post-production expenses greater than would a reasonably prudent operator. In the
recent supreme court opinion, Union Pacific Resources Group, Inc. v. Hankins, No. 01-0836, 2003
Tex. LEXIS 112 (Tex. July 3, 2003), the court reviewed the certification of a class which claimed that
lessees breached an implied duty to "obtain the best current price reasonably obtainable." Id. at * 1. 
The court held that because a covenant to obtain the best price reasonably attainable is implied under
Texas law only to proceeds leases, not to market-value leases, the royalty owners could not establish
that there were "questions of law or fact common to the class" sufficient to support certification. Id.
(quoting Tex. R. Civ. P. 42). As in Union Pacific, each lease in this case must be analyzed to
determine if there is, in fact, an implied duty not to charge post-production expenses greater than
would a reasonably prudent operator. The possible permutations of the leases are endless. In one
lease there might be an express covenant on this subject, and therefore no implied covenant. In
another lease, there might be an implied covenant, but the lessee's burden has been lessened. 
Therefore, because there is no evidence that every lease has an implied covenant to refrain from
charging post-production expenses greater than would a reasonably prudent operator, the royalty
owners cannot establish that common questions of law or fact predominate over individual issues. 
We sustain issues one and two. 

Bernal Trial Plan

 In their third issue on appeal, EOG complains that the certification order is deficient because
it does not include a Bernal trial plan. The following is the trial court's order:


 The requirements of [Bernal] have been met since the common and predominating issues of the case
will be the object of all of the efforts of the litigants and the court with no individual issues to be
determined. In order to resolve all disputes presented in this case, it will be necessary for the plaintiffs
to submit evidence in support of the following factual issues and none other: (1) Did Enron charge
production expenses consisting of compression charges to royalty owners and, if so, what amount was
charged to royalty owners during the period in question; and (2) Did Enron charge royalty owners with
post-production expenses greater than those which a reasonably prudent operator would have charged
and, if so, what is the amount overcharged in each of the specific categories challenged. Production
expenses are generally defined as those expenses incurred in bringing the gas to the mouth of the well
whereas post production expenses are those expenses incurred in readying the gas for marketing after
it has reached the mouth of the well. Post production expenses include such things as plant fuel,
processing and transportation. The evidence concerning compression as a production expense as well
as the evidence concerning whether post production overcharges were made and the exact amounts
involved will be presented via expert testimony. Answers to these two special issues along with an
attorney fee submission will allow the total quantum of damages to be determined. In the final
judgment, all damages found will be proportionately divided among the class members according to
a ratio of each class member's production to the unit total production for the time period involved in
this case. The volumetric data necessary for this determination is located within Enron's existing
database. The first of these two issues is predicated upon breach of the express covenant found in the
leases that royalty is to be free of production expenses while the second issue is premised upon breach
of the implied covenant to reasonably manage the leases. It is anticipated that plaintiffs can present
their case within a two day time period.



 We agree that the above order is not sufficiently detailed to serve as a Bernal trial plan. It
simply reiterates the two causes of action which the trial court agreed to certify. Accordingly, we
sustain issue three.

 

Conclusion

 We conclude that certification is improper because none of the issues identified in the trial
court's order satisfies the predominance requirement of Rule 42. Accordingly, we reverse the
judgment and remand this case to the trial court for further proceedings consistent with this opinion.




 SAM GRIFFITH 

 Justice



Opinion delivered July 31, 2003.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.















(PUBLISH)